[Civ. No. 18759.　First Dist., Div. One.　Oct. 30, 1959.]

GEORGE T. DAVIS, Petitioner, v. SUPERIOR COURT OF MARIN COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

James Martin MacInnis for Petitioner.

Stanley Mosk, Attorney General, Clarence A. Linn, Assistant Attorney General, John S. McInerny, Deputy Attorney General, and W. O. Weissich, District Attorney (Marin), for Respondent and Real Party in Interest.

TOBRINER, J.—We propose to support in more detail *infra* the following conclusions as to Davis's petition for writ of prohibition to restrain the superior court from proceeding further upon the indictment returned against him. The indictment charges a conspiracy to pervert and obstruct justice and the due administration of the law and to cheat and defraud the State of California of property by means of violation of section 4570 of the Penal Code in taking a manuscript out of San Quentin without permission of the warden and by means of such acts to sell and distribute the book. The charge of conspiracy to obstruct justice and to cheat and defraud the state cannot be applied in its full sweep under Penal Code, section 182 subdivision 5. If we narrow down the indictment to a conspiracy under subdivision 1 or 5 of that section to violate section 4570 of the Penal Code, it will stand. Section 4570 is constitutional and the statute of limitations would not bar this prosecution for a conspiracy to violate it. But, in this proceeding, the facts presented the grand jury fail to induce a reasonable probability that the crime as thus defined was committed by petitioner, and the writ should issue.

The proceedings devolve from the writing, removal from prison and publication of a book, "The Face of Justice," by Caryl Chessman, an inmate of California State Prison at San Quentin. All issues in this case flow from the fact that the Warden of San Quentin apparently prohibited this particular inmate from writing manuscripts for publication. The record gives no reason for this ruling, and the only reference to the ruling itself is the testimony of Associate Warden Louis S. Nelson that he was "present" when Chessman was "notified" of an "order . . . forbidding him to write for publication."

Chessman violated the order and wrote the book. The annals of the case do not tell when he wrote it; we know only it must

have been finally completed after January 18, 1957, since it embodies a reference to an editorial in the SAN FRANCISCO NEWS bearing that date.

Petitioner Davis, one of Chessman's attorneys, received the manuscript through the mail, although the prison officials granted no permission to take it out. The record supplies a reason for its receipt by Davis, although the superior court struck from the grand jury transcript the evidence which offers it. The stricken evidence consisted of a written contract by which Davis agreed to render legal services to Chessman, who, in lieu of a fee, agreed to "author, prepare and deliver to George T. Davis within one year from the date of this agreement, a book-length manuscript in, among other things, the nature of a biography pertaining to and covering the legal and personal career of George T. Davis."

Davis probably received the manuscript sometime in the holiday season of 1956-1957 since at that approximate time he left it temporarily for review with San Francisco newspaper columnists Dorothy and Ted Friend. The inclusion in the book of the reference to the NEWS editorial of January 18, 1957, raises a doubt as to the identity of the manuscript which Davis received, but the grand jury apparently resolved this doubt against Davis. Chessman's fingerprints and signature at least authenticate the fact that the document in Davis's hands was an original Chessman manuscript. Its contents, moreover, generally duplicated the book finally published. Not much later, on February 13, 1957, a search of Chessman's cell afforded a carbon copy of the manuscript.

Upon discovery of the removal of the manuscript, first the warden and then the district attorney of Marin County wrote Prentice-Hall demanding its return on the ground the manuscript was the product of prison labor. Prentice-Hall refused; it published the manuscript. Offering the book for sale in California, Prentice-Hall arranged that sales be made directly from its principal place of business in New Jersey and not through its California outlet.

The printed "afterword" of the book purportedly written by petitioner Longstreth, Chessman's literary agent for his first two books, and read to the grand jury in the form of a letter of Longstreth to Chessman, stated that Longstreth received the manuscript shortly after the warden wired him that, if he had the book, he should return it. Longstreth also acknowledged receipt of a demand by the assistant attorney

general of California to return the book. Longstreth wrote, too, that he delivered the manuscript to Prentice-Hall, and that he negotiated as to its publication with various parties including Davis.

The writing, removal, and publication of "The Face of Justice" produced, on December 2, 1958, the indictment of the three petitioners, George T. Davis, Joseph Longstreth, and Prentice-Hall, Inc. The grand jury of the county of Marin accused them under section 182 of the Penal Code of the crime of conspiracy "to pervert and obstruct justice and the due administration of the law and to cheat and defraud the State of California and the Department of Corrections thereof of property by means which are in themselves criminal, and to commit a crime, to wit: Violation of section 4570 of the Penal Code of the State of California, by causing, encouraging, aiding and abetting a person, without the permission of the Warden of San Quentin State Prison, to take and by taking from said San Quentin State Prison, and from a prisoner confined therein, a writing, to wit: the original manuscript of a book entitled 'The Face of Justice,' authored by an inmate of said State Prison, to wit: the said CARYL CHESSMAN, and by means of the foregoing unlawful acts to publish, sell and distribute said book within the County of Marin, State of California, and elsewhere.''

The overt acts alleged in the indictment are: (1) the writing of the book by Chessman; (2) removal of the original manuscript from the prison; (3) exhibition by Davis to Miss Asher of the original manuscript; (4) exhibition by Davis of the manuscript to Mr. and Mrs. Friend; (5) delivery of the manuscript outside of California by Davis to Longstreth; (6) delivery of the manuscript outside of California by Longstreth to Prentice-Hall after demand for return of the book had been made to Longstreth by the warden; and (7) publication and distribution of the book by Prentice-Hall.

Petitioners filed motions to dismiss the indictment on the grounds that (1) the alleged violation was barred by the statute of limitations, (2) sections 182 and 4570 of the Penal Code were unconstitutional, and (3) the transcript before the grand jury did not contain competent evidence. Upon denial of these motions petitioners filed petitions for writs of prohibition in this court, requesting that the superior court be restrained from any further proceedings in this matter.

We begin with the problem of the extent to which

Penal Code, section 182 subdivision 5 may be constitutionally invoked to support such an indictment as the instant one. The section declares punishable a conspiracy ''[t]o commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws.'' Confining the indictment to an application of section 182, subdivision 5, to a conspiracy to obstruct justice and the due administration of the law by means of violation of Penal Code, section 4570, we believe the section can be construed to pass the test of constitutionality. Accepting the indictment in its stated language ''to cheat and defraud the State of California and the Department of Corrections thereof of property'' by such means, and assuming a constitutional' application of the section, the indictment fails to charge a crime.

To paraphrase the Supreme Court of the United States, section 182 subdivision 5 ''is no narrowly drawn statute,'' and if it is not to ''run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused'' (*Musser* v. *State of Utah* (1947), 333 U.S. 95, 96, 97 [68 S.Ct. 397, 92 L.Ed. 562]), it must be given content by the cases.

The Utah statute construed in Musser (§ 103-11-1, Utah Code Ann. 1943) differed from the instant legislation only in the inclusion in the Utah version of the words ''or to trade or commerce'' after the words ''public morals.'' Holding the statute unconstitutional unless limited by judicial construction of Utah to supply more definite standards, the Supreme Court said as to the statute, ''Standing by itself, it would seem to be a warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order.'' (Pp. 96, 97.) Upon remand the Utah Supreme Court found itself ''unable to place a construction on these words which limits their meaning beyond their general meaning'' (*State* v. *Musser* (1950), 118 Utah 537 [223 P.2d 193, 194]), and held the statute unconstitutional.

The unconstitutionality of the California statute, however, rests upon the fact that three cases have charted boundaries to its otherwise limitless sea of criminality.

In *Lorenson* v. *Superior Court* (1950), 35 Cal.2d 49 [216 P.2d 859], the prosecution indicted a police captain and others for conspiracy to commit robbery, to commit assault with a deadly weapon and to pervert or obstruct justice or the due administration of the laws. The court explains that "In California, the statutes relating to 'Crimes Against Public Justice' are found in part I, title VII, of the Penal Code." (P. 59.) Hence, "[t]he meaning of the words 'to pervert or obstruct justice, or the due administration of the laws' is easily ascertained by reference either to the common law or to the more specific crimes enumerated in part I, title VII. A conspiracy with or among public officials not to perform their official duty to enforce criminal laws is an obstruction of justice and an indictable offense at common law." (Pp. 59-60.) The conspiracy of the public officials to commit acts of malfeasance constituted an indictable offense at common law and was sufficiently described by the section.

Paralleling Lorenson, *People* v. *Sullivan* (1952), 113 Cal. App.2d 510 [248 P.2d 520], likewise involved a misfeasance of a public officer. The indictment charged that defendant city manager conspired with others to use her official position to enact a zoning ordinance which inured to her and the conspirators' advantage. Penal Code, section 70, forbids and punishes emoluments, gratuities or rewards of executive or ministerial officers of the state, county or municipality. Upholding the conviction, the court concluded, "[T]he evidence is sufficient to show a violation of section 70 of the Penal Code and the indictment sufficiently charges a conspiracy to violate section 182 of the same code." (P. 522.) The court answers defendants' constitutional argument and reliance upon Musser by citing Lorenson which "is binding upon us." (P. 523.)

The third California case, *Calhoun* v. *Superior Court* (1955), 46 Cal.2d 18 [291 P.2d 474], adjudicated an indictment of defendant for conspiracy to commit acts in violation of the Elections Code and " 'to do acts injurious to the public morals and to pervert and obstruct justice.' " (P. 20.) Defendant Calhoun, public relations man and general counsel, and defendant Bonelli, a member of the Board of Equalization, were charged as conspirators for the illegal solicitation of campaign funds. To a contention as to the unconstitutionality of section 182 subdivision 5, the court replied that the statute had been "expressly upheld" in Lorenson and Sullivan. The court alludes to the "full consideration" which was "given

to the decision in *Musser* v. *Utah*," in these cases but in truth Lorenson did not so much as mention Musser, and Sullivan errs in implying that it did so.

The cases thus give content to the statute. "Considering the well-settled meaning at common law of the words 'to pervert or obstruct justice or the due administration of the laws,' the other and more specific provisions in the Penal Code concerning 'Crimes Against Public Justice' and the relative certainty of words employed in statutes which have been held valid, it cannot be said that subsection 5 of section 182 of the Penal Code is unconstitutional." (*Lorenson* v. *Superior Court, supra* (1950), 35 Cal.2d 49, 60-61.) The reference to "Crimes Against Public Justice" does not necessarily exclude a crime not defined within the four corners of that part I, title VII, of the Penal Code, such as section 4570, involved in this indictment. The court's reference to such crimes was illustrative, rather than exclusionary; the type of conduct with which title VII principally deals falls within the category of acts "to pervert or obstruct justice."

Thus the court did not, for example, mean to exclude from the category of acts "to pervert or obstruct justice" corrupt conduct of attorneys formerly prohibited by sections 160 and 161 of title VII but now proscribed by sections 6128 and 6129 of the Business and Professions Code, a part of the State Bar Act. Nor do we believe that the court meant thereby to include as acts "to pervert or obstruct justice" the illegal sale of liquor within certain distances of the several educational institutions proscribed in sections 172, 172a and 172d under title VII.

Turning to Penal Code, section 4570, it was, prior to 1941, contained in title VII. It has since been removed only for inclusion under a more appropriate heading. Moreover, title VII presently includes a prohibition as to reformatories which parallels that of section 4570. We cannot find that the inhibition as to the writing at a reformatory constitutes a public crime while that applicable to a prison does not. To draw so thin a line in view of the historical reason for the change in the place of section 4570 would thwart the legislative intent.

Hence, as interpreted by the California cases, section 182, subdivision 5, is not limitless but contracted; it includes, in substance, the type of crime described in section 4570. The indictment charging the conspiracy to remove the manuscript

does not fail on the ground of the unconstitutionality of section 182, subdivision 5.

■ But the indictment attempts to frame a charge under 182(5) far wider than a conspiracy to remove the manuscript; it alleges a conspiracy to obstruct justice and the due administration of the law and to cheat and defraud the State of California of property by criminal means. Indeed the prosecution has taken an emphatic position that the indictment must be treated as a whole, alleging a conspiracy for this latter purpose.

We shall assume that the indictment in this respect does not rest upon an unconstitutional application of section 182, subdivision 5. It is arguable that whereas the indictment, limited to a conspiracy to obstruct justice and the administration of the law by the unpermitted removal of the manuscript, becomes specific in a violation of Penal Code, section 4570, there is no statutory haven for the conspiracy to "cheat and defraud" the State of California of its property unless such conduct could be related to the administration of justice; that there is no such showing here; that section 182, subdivision 5, so applied finds no sanction in the California cases, and runs afoul of Musser. We are not called upon to decide this question because the indictment, founded on the concept that the state was cheated and defrauded of its property, fails for the basic reason that the Chessman manuscript did not become the property of the state.

Chessman obviously created the book, and the state's acquisition of it must rest upon some statutory provision. It is true that Penal Code, section 2701, provides the Department of Corrections may "cause . . . prisoners . . . to be employed in the rendering of such services and in the production . . . of such articles . . . as are . . . needed by the State" or other named political subdivisions. But the department did not employ Chessman to write the book; it forbade such writing; and the book was not "needed" by the state. The prior section 2700 empowers the department to "require of every able-bodied prisoner . . . as many hours of faithful labor" as prescribed by the rules, but the warden's rule prohibited, rather than required, the writing of the book, if, indeed, it is an output of "faithful labor" at all.

In the second place, the argument that the violation by Chessman of the warden's order not to write results in Chessman's forfeiture of his interest in the book, is confronted by

section 2604 of the Penal Code which provides: "No conviction of any person for a crime works any forfeiture of any property, except in cases in which a forfeiture is expressly imposed by law; and all forfeitures to the people of the State, in the nature of a deodand, or where any person shall flee from justice, are abolished.''* If there could be no forfeiture in the case of a conviction for a crime, *a fortiori* there could be no forfeiture for a mere violation of an administrative order.

Moreover, application of the section to manuscripts would do violence to section 2603 of the Penal Code. While section 2602 provides: "A person sentenced to death is deemed civilly dead during the existence of the death sentence," a restriction on that provision, contained in section 2603, provides: "The provisions of the last three preceding sections must not be construed to render the persons therein mentioned . . . incapable of making . . . a sale . . . of property." That the completed manuscript was a form of property, which had commercial value, cannot be denied; indeed, the state urges that it has been cheated and defrauded of this "property."

Finally, the state's theory leads to an incongruous power vested in the warden. We would be compelled to assume the warden is empowered to give away state property by permitting the manuscript to be taken from the prison. Yet this would violate the express prohibition of article IV, section 31, of the Constitution of the State of California: "The Legislature shall have no power . . . ; nor shall it have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual . . . whatever. . . .''

If, on the other hand, we assume that the writing remains the property of the state whether or not permission to remove it is granted, then twice in the past the warden gave away state property by allowing Chessman to sell his two prior books. Every letter, writing, and piece of literature sent out of a prison, even with permission, being the property of the state, could be recovered by it when and if it pleased.

Neither statute nor constitution supports the prosecution's theory that the state acquires the ownership of an incarcerated person's creativity or individuality; there are limits to the

---

*A *deodand* is any "personal chattel which was the immediate occasion of the death of any reasonable creature, and which was forfeited to the crown to be applied to *pious* uses, and distributed in alms by the high almoner." (Black's Law Dictionary (4th ed. 1951), p. 523.)

state's powers even in this specific circumstance. An odor of totalitarianism infects the concept that any product of the prisoner's mind automatically becomes the property of the state. While a free society recognizes the social need for incarceration of offenders, it claims no possession of their minds. We want no easy or invious adoption of techniques for state domination of an individual's identity, even if he is imprisoned and even if the immediate purpose of a particular prison regulation may be understandable.

The indictment cannot, then, be upheld as a charge of conspiracy under 182, subdivision 5, for the avowed purposes of taking the book from San Quentin and publishing the contents, so that the State of California was cheated of its property. We turn to the possibility that the indictment may be reduced to a more limited scope: to a conspiracy under section 182, subdivision 1 to "commit any crime"; that is to violate Penal Code, section 4570. Indeed, we consider the indictment here, likewise, as a charge of conspiracy under 182, subdivision 5, for the limited purpose of violating section 4570. This inquiry leads us, first, to examine the contention of the petitioners that section 4570 is unconstitutional; second, to ascertain whether prosecution of a conspiracy to violate it is barred here by the statute of limitations; and, third, to determine whether or not the grand jury could infer from the evidence that petitioner did so engage in a conspiracy to take the manuscript from the prison in violation of section 4570.

The petitioner's contention that Penal Code, section 4570, is unconstitutional rests upon the proposition that it contains an unlawful delegation of power and it suppresses constitutional rights.

The instant provision is but one of the many statutory provisions by which the Legislature authorizes the wardens of penal institutions to insure their internal security. Such delegation of authority to the warden to permit or refuse communication with a prisoner finds parallel delegations to the warden in related matters: section 4571 provides similar authority as to ex-convicts coming upon prison or camp grounds or adjacent land to the prison; section 4572, as to tramps, vagrants and known associates of thieves coming upon such areas or communicating with inmates; section 4573.5, as to bringing into the prison, camp or jail unauthorized drugs; and section 4573.6, as to possession of drugs, narcotics and alcoholic beverages in prison, camp, jail, etc. These statutory

provisions flow from article X, sections 5 and 6, of the California Constitution, endowing the Legislature with the right to delegate to state prison authorities the regulation of the activities of its prisoners. Section 4570, like its counterparts, authorizes the warden to exercise a reasonable discretion in the administration of the prison and does not as such unlawfully delegate legislative power.

To censor and in certain instances to forbid communication to and from a prison is inherent in its administration. Such authority is necessary to protect against escape. Of course an absolute isolation of those incarcerated in a penal institution by a ban on communication by them with the outside population would constitute an unreasonable exercise of that power. ■ But the possibility of arbitrary use of a delegated power does not nullify the delegation. (See *Trinity County* v. *Mendocino County* (1907), 151 Cal. 279, 287 [90 P. 685] ; *California State Auto. etc. Bureau* v. *Downey* (1950), 96 Cal.App.2d 876, 906 [216 P.2d 882] ; *Moore* v. *Municipal Court* (1959), 170 Cal.App.2d 548, 557-558 [339 P.2d 196].) Reasonable rules prohibiting visitations or communication will stand. (*Akamine* v. *Murphy* (1951), 108 Cal.App.2d 294 [238 P.2d 606].) ■ The warden's ban on Chessman's writing necessarily forbids the removal of the written material from the prison, and the latter prohibition, with which we are exclusively concerned here, is not *per se* unreasonable.

The same considerations answer petitioner's contention that the section unconstitutionally deprives the inmate of property without due process of law and the right of free speech. While, as we have pointed out, *supra*, the state owns no property in the creativity of the incarcerated person, he must obviously, by the very fact of incarceration, suffer curtailment of the normal freedoms of speech and communication.

■ We turn to petitioner's contention that the statute of limitations bars the instant prosecution for a conspiracy under Penal Code, section 4570. He contends that since violation of section 4570 constitutes a misdemeanor it cannot be here prosecuted as a felony without violation of his constitutional right.

Petitioner's argument rests upon the accepted fact that more than one year had run from whatever date might be fixed as the time of the commission of the presumed crime. Whether we take the last date which relates to the ''taking'' from the prison, February 13, 1957, when the correctional officer discovered a carbon copy of the manuscript in Chessman's cell,

or the actual date of publication or distribution of the book, September 1957, the date of the return of the indictment occurred subsequent to one year from either of such above presumed dates of transgression. Thus the period of one year limitation on misdemeanors (Pen. Code, § 801) had passed but not the three-year period on most felony prosecutions (Pen. Code, § 800).

Petitioner contends that under the embrasure of section 182, the source of the indictment, the original misdemeanor, an alleged violation of Penal Code, section 4570, is "ballooned into a supposed felony," two years later, after "the statute of limitations has passed on the misdemeanor," even though section 182 "does *not* provide that such a conspiracy *is* a felony." Yet past decisions meet the contention. ▆ The postponed determination of a court as to whether an offense constitutes a felony or misdemeanor does not, even if the court designates the offense a misdemeanor, nullify the judgment because the statute might have run on the misdemeanor.

▆ *People* v. *Weaver* (1943), 56 Cal.App.2d 732 [133 P.2d 818], a decision of Justice White, construes Penal Code, section 17, in relation to Penal Code, section 801. Section 17 in substance "provides that when a crime punishable by imprisonment in the state prison is also punishable by . . . imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes *after a judgment* imposing a punishment other than imprisonment in the state prison." (P. 737.) Section 801, of course, provides prosecution for a misdemeanor must be filed within one year of its commission. In the cited case, more than one year having elapsed between the date of the commission of the crimes charged and the date of filing, defendants offered the same argument as is raised here. Pointing out that the previous case of *Doble* v. *Superior Court* (1925), 197 Cal. 556, 576 [241 P. 852], disposed of the contention, the court said, "In that case it was held that the provision of Penal Code, section 17 upon which appellant relies had a prospective operation; that by the words 'after a judgment' it was meant that the crime should be regarded as a misdemeanor only for purposes subsequent to judgment if a fine or county jail sentence be imposed; and that the judgment by which the crime was made a misdemeanor was not to have a retroactive effect so far as the statute of limitations is concerned." (P. 738.) Section 182 similarly provides that when defendants "conspire to do any of the other acts described in this section" (characterized as

felonies) they "shall be punishable" in the same manner as misdemeanors. The analogy of sections 182 and 17 appears complete; the reasoning of the court applies to both.

Petitioner's cases do not affect the result. *People* v. *Picetti* (1899), 124 Cal. 361 [57 P. 156], and *People* v. *Angelo* (1938), 24 Cal.App.2d 626 [75 P.2d 614], are specifically described as "readily distinguishable" (p. 738) in Weaver since in each the violation was a "misdemeanor *ab initio*"; in our situation we deal with an alleged conspiracy, not a bare misdemeanor. Finally, in *Grunewald* v. *United States* (1957), 353 U.S. 391 [77 S.Ct. 963, 1 L.Ed.2d 931, 62 A.L.R.2d 1344], upon which petitioner relies heavily, the federal government sought to avoid a three-year statutory bar upon the original conspiracy by charging defendants with a subsequent conspiracy to conceal the precedent one. The court held that in the absence of evidence showing an express agreement among the conspirators to continue to act in concert in order to cover up subsequent traces of the crime, a conspiracy would not be implied from circumstantial evidence showing merely that they secreted the original conspiracy and crime.

We now turn to the final and decisive question as to whether or not the facts presented the grand jury were sufficient to induce a reasonable probability that petitioner conspired to violate section 4570. The prosecution must make this showing, not only as to an indictment under section 182, subdivision 1, that petitioner conspired to violate section 4570 but also if the indictment under section 182, subdivision 5, is redrawn to omit reference to cheating and defrauding the state of its property and confined only to violation of section 4570. The prosecution produced the following evidence as to Davis: (1) the possession of the manuscript; (2) the testimony as to the contract and the correspondence; (3) the content of the manuscript itself; (4) the past relationship of the parties. We have concluded that these are not sufficient to sustain the indictment.

In defining reasonable or probable cause (Pen. Code, § 995), the courts have said: "The term 'probable' has been defined to mean 'having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt' " (*Ex parte Heacock* (1908), 8 Cal.App. 420, 421 [97 P. 77]) ; a " '[r]easonable or probable cause' means such a *state of facts* as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (Em-

phasis added; *People* v. *Nagle* (1944), 25 Cal.2d 216, 222 [153 P.2d 344].) ▇ "[T]he writ will issue if no competent evidence was offered at the preliminary examination to support a reasonable belief that the offense charged was committed and that the defendant committed it." (*Rogers* v. *Superior Court* (1955), 46 Cal.2d 3, 8 [291 P.2d 929].) ▇ "Conspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense." (*People* v. *Long* (1907), 7 Cal.App. 27, 33 [93 P. 387].)

▇ The possession of the manuscript in itself supplies no evidence or proof that Davis took, or engaged in the taking of, the manuscript from the prison. Following the analogy of the situation involved in the receipt of stolen goods, the act of accepting such goods, even with the knowledge that they are stolen, does not make out an inference of guilt of the stealing. Thus in *People* v. *Roderiquez* (1911), 16 Cal.App. 358 [116 P. 986], the court said, "The mere possession of property recently stolen is not of itself sufficient evidence on which to convict a defendant of theft. . . . [T]here is nothing in the record tending to show that Roderiquez was present, or aided or abetted in the commission of the offense. . . ." (P. 360.) To the same effect *People* v. *Shepardson* (1874), 48 Cal. 189; *People* v. *Collum* (1898), 122 Cal. 186 [54 P. 589]; *People* v. *Disperati* (1909), 11 Cal.App. 469 [105 P. 617].

In the similar situation of determining the guilt of defendant for aiding in an escape from a penitentiary, the courts have held that the fact that a defendant may have consorted with an inmate subsequent to escape does not show probable cause that he "had anything to do with the escape." (*People* v. *Ramos* (1952), 113 Cal.App.2d 631 [248 P.2d 423]; *People* v. *Parker* (1954), 122 Cal.App.2d 867 [265 P.2d 933].)

Respondent urges that Davis stood to gain from the receipt of the manuscript since he was to share in profits made from its sale and publication. But the possibility of such profit adds nothing substantial toward proof of participation in a conspiracy to remove the manuscript. The fact that a recipient of stolen goods may profit from the subsequent sale of the goods does not show guilt of the theft. Here the receipt of the manuscript, even if Davis were to profit eventually from it, does not show he wrongfully conspired to take it from the prison.

The second factor upon which respondent relies consists of

a congeries of documents read by the district attorney to the grand jury. The prosecution particularly emphasizes the testimony as to "admissions" of Davis "that he had entered into a contract with Chessman whereby Chessman agreed to author, prepare and deliver to the petitioner Davis within one year a book-length manuscript. . . ." (Memorandum of Points and Authorities in Opposition to Petitions for Writs of Prohibition, p. 23.) The district attorney also testified to correspondence which was exchanged between the representatives of the state and petitioner Prentice-Hall and an excerpt from the copy of the printed book constituting the "afterword," purportedly signed by Longstreth, which we referred to at the beginning of this opinion. Respondent supports the introduction of such evidence on the ground that it "constituted admissions made by the co-conspirators during the course of the conspiracy." (*Idem.*, p. 25.)

Considering, first, the correspondence and the "afterword," these are hearsay statements not admissible against Davis in the absence of independent proof tending to establish the conspiracy. (*Taylor* v. *Bernheim* (1922), 58 Cal.App. 404 [209 P. 55].) ▇ The fact of conspiracy cannot be proved by evidence of extrajudicial declarations of an alleged coconspirator. (11 Cal.Jur.2d 253.) ▇ Only after and upon the proof of the conspiracy itself can such declarations be admitted. (*Leavitt* v. *Gibson* (1935), 3 Cal.2d 90 [43 P.2d 1091].) Indeed, the very danger of admitting such hearsay testimony is that it might be accepted by the jury as proof of the existence of the conspiracy itself. (*People* v. *Irwin* (1888), 77 Cal. 494 [20 P. 56]; see *People* v. *Parker* (1954), 122 Cal. App.2d 867, 874 [265 P.2d 933].)

▇ The absence of independent evidence of the conspiracy in the instant case cannot be overcome by the device of introduction of alleged hearsay statements of coconspirators. The conspiracy cannot be built upon imposed vicarious responsibility for other persons' declarations to whom a defendant has not been related by some showing of common action.

Turning to the contract, it does no more than make explicit the nature of Davis' profit in the publication of the book. We have suggested *supra* that the possibility of a defendant's gain in disposing of wrongfully taken goods does not furnish proof of his participation in the wrongful taking.

Petitioner further urges that the testimony as to the contract was inadmissible because it was elicited from petitioner in violation of Penal Code, section 1323.5. The superior court upheld petitioner's position and ordered the testimony

stricken. The ruling rests upon the fact that Davis was called before a 1957 grand jury upon the assurance that he was merely a witness rather than a prospective defendant, and the above testimony, thus adduced, inured to defendant's harm. We need not rely upon this contention for exclusion of the testimony in view of our stated position.

The third fact upon which the prosecution relies as proof of petitioner's participation in the conspiracy rested in certain statements in the book itself. While the language on page 22 of the book could conceivably be interpreted to indicate that Davis planned with Chessman wrongfully to withdraw the manuscript in disregard of the warden's prohibition of Chessman's writing, the text likewise may be read to mean that Davis contemplated a legal procedure to test the legality of the warden's order. We need not resolve the ambiguity because the book, too, is hearsay which cannot be used to prove the existence of the conspiracy itself. The book can be used only *after* such showing; it is not self-generative of conspiracy; it is only additional evidence of conspiracy otherwise established.

Finally, the prosecution infers that proof of the conspiracy could lie in the past relationship of Davis and Chessman and the fact that Davis served as Chessman's attorney. To use the words of Justice Carter in his dissent in *Lorenson* v. *Superior Court, supra* (1950), 35 Cal.2d 49, "This is akin to holding that guilt by association should be the rule, instead of the philosophy underlying all American jurisprudence that before a person can be charged with crime, there must be reasonable and probable cause as a basis for such charge." (P. 68.) (See *Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153 [183 P.2d 724].)

There is a deeper objection which reaches to the heart of the prosecution's case. As we have said, the prosecution conceives of the conspiracy not merely to take the book from the prison but "to both smuggle the book out and to then publish the book, thereby perverting the laws of the State, obstructing justice and cheating the State of California of a valuable property right. . . ." (Memorandum of Points and Authorities in Opposition to Petitions for Writs of Prohibition, p. 11.) Apparently the prosecution admits that "[i]n this case if the petitioners could show that they first joined the conspiracy *after* Chessman's book had successfully been smuggled out of prison, they would not be liable . . . [under] Penal Code section 4570." (*Idem.,* p. 11; emphasis added.) We have already explained that the conspiracy cannot properly extend

to cheating and defrauding the state of its property by taking and publishing the book but must narrow down to the conspiracy for violation of section 4570. There is not a scintilla of evidence to show that any of the petitioners joined a conspiracy to take the book out of the prison, that is, to accomplish the limited objective which is the only kind of conspiratorial purpose the indictment will support.

We cannot fashion a conspiracy for the alleged "smuggling" from subsequent participation in actions relating to sale and publication. Apparently it is the latter upon which the prosecution depends. Yet upon that theory the petitioners would be vicariously charged with criminal acts committed *before* they joined the conspiracy. We have recently said: "[T]he Supreme Court of California, in *People* v. *Weiss* . . . rejected the contention that a conspirator is liable for criminal acts of his fellow conspirators committed prior to the time he joined the conspiracy." (*People* v. *Feldman* (1959), 171 Cal.App.2d 15, 21 [339 P.2d 888]; see *People* v. *Zoffel* (1939), 35 Cal.App.2d 215 [95 P.2d 160]; *People* v. *Malone* (1959), 167 Cal.App.2d 400 [334 P.2d 217].)

Assuming that a conspiracy occurred to remove the manuscript from San Quentin, there is no evidence upon which the grand jury could draw any inference that the petitioner Davis or, indeed, petitioners Longstreth and Prentice-Hall joined such a conspiracy. The attempt to charge petitioners retroactively with a conspiracy to remove the manuscript from the prison, absent some evidence to connect them with that conspiracy, would violate the precept established in the cited cases.

In summary, the indictment in its full sweep, based upon the theory that the state acquires an automatic ownership in a prisoner's creativity, attempts a novel and unsupportable innovation in the law. But even if we exculpate from it the narrower construction that it applies to a conspiracy to effect an unpermitted taking of the manuscript from the prison, we must, to uphold it, contrive the facts, compound inference upon inference and rely upon associational guilt. We cannot conceive that an indictment for a felony should rest upon such artificiality.

Let a peremptory writ of prohibition issue.

Bray, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied November 25, 1959, and the petition of the Real Party in Interest for a hearing by the Supreme Court was denied December 23, 1959.