427 P.2d 928

**The STATE of Arizona, Appellee,**

v.

**Sandy BOWLING, and Harold Cook, Appellants.**

**No. 2 CA–CR 79.**

Court of Appeals of Arizona.

May 16, 1967.

Rehearing Denied June 12, 1967.

Review Denied Sept. 21, 1967.

---

See also 102 Ariz. 31, 424 P.2d 159.

Darrell F. Smith, Atty. Gen., Carl Waag and Jordan Green, Asst. Attys. Gen., Phoenix, William J. Schafer, III, County Atty., Pima County, Tucson, for appellee.

Lawrence P. D'Antonio, Tucson, for appellant Bowling.

Joseph H. Soble, Tucson, for appellant Cook.

MOLLOY, Judge.

The defendants in this action appeal from convictions upon two counts of an indictment rendered against them by a grand jury. Both were charged in count one of this indictment with conspiracy to commit an act "* * * injurious to the public morals or unlawfully perverting or obstructing justice or due administration of the laws * * *" and in count two of receiving a bribe, while a member of the Arizona State Legislature, "* * * upon an understanding that their official opinions, judgments and actions should be influenced thereby * * *".

The facts giving rise to these charges are substantially without dispute. A resident of Pima county by the name of Jerry Hanson, the co-proprietor of a tavern, was desirous of obtaining a new liquor license for his business, which would permit the sale of additional types of liquor.[1] He had a conversation with Bowling, one of the defendants, who was at the time a member of the House of Representatives of the Arizona State Legislature, about assistance in obtaining such license. Bowling informed Hanson that he might be able to assist him, and arranged a meeting between Hanson, himself, and the other defendant, Cook, who was also a member of the Arizona House of Representatives. Hanson testified that Cook was introduced to him only as a legislator, while Bowling testified that Cook was introduced as a real estate broker. At this meeting, Hanson was informed that it would cost approximately $5,000 for the license over and above regu-

1. Hanson had a "No. 7" license which permitted him to sell wine and beer only to his patrons; he desired to secure a "No. 6" license which would permit him to sell all spirituous liquors. A.R.S. § 4-209, subsec. B.

lar license fees and at a subsequent meeting, it was agreed that Hanson would pay $4,200, over and above the normal license fees, if the liquor license was obtained for him.

An application for such a license was duly submitted and a personal conference with Mr. John Duncan, Superintendent of Liquor Licenses and Control for the State of Arizona, followed, with Hanson, Bowling and Cook all speaking in behalf of the issuance of the license. The statements made in support of issuing the license were in the nature of character references for Hanson and his father, who was a partner in the tavern, and included the argument that such a license was needed because two families were to be supported from this one business. There was no showing in the evidence of any inducements being offered to Mr. Duncan to issue the license nor of any improper persuasions advanced. The testimony is undisputed that Hanson was fully qualified under applicable law for the issuance of the license and that the location as to which the license application pertained fulfilled all of the legal requirements for such a license.[2]

About a month after the conversation with Duncan, Cook contacted Hanson to inform him that the license had been issued, and Cook together with Bowling, brought the license to Hanson's home, where Hanson gave them $4,200 in cash. Bowling testified that all of this money was received and retained by Cook; Cook did not take the stand during the trial.

Numerous questions are raised on appeal, but it is our judgment that this proceeding must be disposed of on the basis of the contention that the trial court erred in refusing to direct a verdict of acquittal at the close of the State's case as to both counts of the indictment.

Count one of the indictment charges a crime under A.R.S. § 13–331. This statute, insofar as pertinent here, reads as follows:

"A. It is unlawful for two or more persons to conspire to:

\* \* \* \* \* \*

"5. Commit any act injurious to the public health or public morals.

"6. Pervert or obstruct justice or due administration of laws.

"B. A person who violates any provision of this section shall be punished by imprisonment in the state prison for not to exceed one year, or by a fine not exceeding one thousand dollars.

"C. No conspiracies other than those enumerated in this section are punishable criminally."

From this statute, the following language was selected to charge that the defendants: "\* \* \* did unlawfully conspire with each other to obtain a Series No. 6 Arizona State Liquor License for one JERRY HANSON from JOHN A. DUNCAN, the Superintendent of the Arizona State Department of Liquor Licenses and Control, \* \* \*[3] such act being injurious to the [4] public morals or unlawfully perverting or

---

**2.** A.R.S. § 4–207 prohibits the issuance of a liquor license for any building within three hundred feet of a public or parochial school or church, or upon land under the jurisdiction of the state fair commission.

**3.** We have deliberately omitted the following language:
"\* \* \* for the sum of $4200.00 above the lawfully set State fees for such a license, such sum of money being paid by the said JERRY HANSON and received by SANDY BOWLING and HAROLD COOK for the said SANDY BOWLING'S and HAROLD COOK'S obtaining said license from the office of

the aforesaid JOHN A. DUNCAN \* \* \*"
We consider this to be a statement of the consideration for the act as to which an illegal conspiracy is alleged to have occurred. This allegation is similar to the allegations of consideration in State v. Sullivan, 68 Ariz. 81, 200 P.2d 346 (1948), proof of which was held to be insufficient to establish overt acts of conspiracy.

**4.** In the original indictment, the words "public health or" were included here, but these three words were stricken from the indictment at the time of trial on motion of the prosecution.

obstructing justice or due administration of the laws * * *."

Initially, the appellants challenge the language charged in the indictment—that they conspired to commit an act "injurious to public morals"—on the grounds that it is unconstitutionally indefinite. In State v. Locks, 97 Ariz. 148, 397 P.2d 949 (1964), the Supreme Court of this state struck down as unconstitutionally vague a statute making it a misdemeanor to publish an "obscene or indecent picture." In this decision our Supreme Court said:

> "The law must be definite and certain so that the same standard of conduct may be applied by all persons affected. The dividing line between what is lawful and unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes, the mandates of which are so uncertain that they will admit to different constructions. The crime and the elements constituting it must be so clearly expressed that the ordinary person can intelligently choose in advance what course it is lawful for him to pursue."

97 Ariz. at 150, 397 P.2d at 951.

In considering a Utah statute with similar wording,[5] the Supreme Court of the United States said:

> "Standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order."

Musser v. State of Utah, 333 U.S. 95, 68 S.Ct. 397, 398, 92 L.Ed. 562 (1948).

The Supreme Court of the United States remanded the *Musser* case to the Utah Supreme Court to consider whether the language of this statute was unconstitutionally vague. The United States Supreme Court suggested that there was a possibility that under Utah statutory or case law the broad language of the statute might have been limited so as to give the required degree of specificity thereto.

The Supreme Court of Utah, however, was unable to point to any limitations upon the subject language and came to the conclusion that this statute, making it a crime to conspire to commit an act "* * injurious * * * to public morals * *" was unconstitutional:

> "No language in this or any other statute of this state or other law thereof or any historical fact or surrounding circumstance connected with the enactment of this statute has been pointed to as indicating that the legislature intended any limitation thereon other than that expressed on the face of the words used. We are therefore unable to place a construction on these words which limits their meaning beyond their general meaning. The conviction of the defendants thereunder cannot be upheld. This part of the statute is therefore void for vagueness and uncertainty under the Fourteenth Amendment to the Federal Constitution."

State v. Musser, 118 Utah 537, 223 P.2d 193, 194 (1950).

■ Likewise, we know of no statutory or case law in this state which limits the broad sweep of that which is encompassed within the words "* * * injurious to * * * public morals * * *". Common-law crimes have not survived in this state, and unless certain conduct is singled out by criminal statute, conduct is not a crime no matter how reprehensible. Goodman v. State, 96 Ariz. 139, 393 P.2d 148 (1964).

---

5. The defendants were charged in this case with conspiring "* * * * to commit acts injurious to public morals * * *" (68 S.Ct. at 397) under a criminal statute which made it a crime "[t]o commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice or the due administration of the laws * * *" (68 S.Ct. at pp. 397–398.)

■ We are aware that if a criminal statute refers by name to a common-law crime, the elements of that common-law crime may give sufficient definitiveness to statutory language. State v. Cota, 99 Ariz. 233, 408 P.2d 23 (1965). However, we know of no common-law crime which bears analogy to the committing of an act "injurious to public morals."

■ In our view, these key words are even more vague and indefinite than the language "obscene or indecent," which was struck down by our Supreme Court in State v. Locks, supra. We follow the specific holding of State v. Musser, supra, in declaring that this language is not sufficiently definite to satisfy due process requirements.

The State has contended that California, from whence our state adopted the statutory language under which these defendants were charged,[6] has upheld the statute as to constitutionality. The cases cited are: Lorenson v. Superior Court, 35 Cal.2d 49, 216 P.2d 859 (1950); People v. Sullivan, 113 Cal.App.2d 510, 248 P.2d 520 (1952); Calhoun v. Superior Court, 46 Cal.2d 18, 291 P.2d 474 (1955); and Davis v. Superior Court, 175 Cal.App.2d 8, 345 P.2d 513 (1959). An examination of these decisions, however, will disclose no reliance upon that portion of the statute pertaining to acts injurious to the "public morals." These decisions all lean upon the words "to pervert or to obstruct justice or the due administration of the laws", as illustrated in the following language in *Lorenson:*

"Considering the well-settled meaning at common law of the words 'to pervert or obstruct justice, or the due administration of the laws', the other and more specific provisions in the Penal Code concerning 'Crimes Against Public Justice', and the relative certainty of words employed in statutes which have been held valid, it cannot be said that subsection 5 of section 182 of the Penal Code is unconstitutional."

216 P.2d at 866.

In each of the four California cases, there was at least one specific criminal statute as to which the charges of conspiracy related. Here the State points to no criminal statute which the defendants are charged to have conspired to violate. Hence, under these California decisions, this charge can be sufficiently specific only if it charges a conspiracy to commit an act which would constitute the common-law crime "to pervert or obstruct justice, or the due administration of laws." *Lorenson* undertakes to define this common-law misdemeanor in this language:

"Section 182 defines as criminal conspiracy acts committed with the purpose ' * * * to pervert or obstruct justice, or the due administration of the laws.' [G]enerally speaking, conduct which constitutes an offense against public justice, or the administration of law includes *both malfeasance and nonfeasance by an officer in connection with the administration of his public duties,* and also *anything done by a person in hindering or obstructing an officer in the performance of his official obligations.* Such an offense was recognized at common law and generally punishable as a misdemeanor. Now, quite generally, it has been made a statutory crime and, under some circumstances, a felony. Burdick, Law of Crimes [1946], vol. 1, p. 382, et seq.; 20 Cal.Jur. 347–354." (Emphasis added)

216 P.2d at 865.

In *Davis*, in rejecting the contention that the "obstruction of justice" statute was unconstitutional on its face, the court said:

"The constitutionality of the California statute, however, rests upon the fact that three cases have charted boundaries to its otherwise limitless sea of criminality."

345 P.2d at 517.

6. The historical note following § 13–331 indicates that it was adopted from West's Annotated Penal Code §§ 182 and 183.

These California decisions leave open the possibility that the remaining language in count one of the subject indictment— "unlawfully perverting or obstructing justice or due administration of the laws"— properly charges a criminal offense. In this regard, the appellants do not directly attack this charging language upon constitutional grounds, but rather on the basis of lack of proof. In considering this argument, we have concluded that unless the acceptance of $4,200 by the defendants constituted a violation of this law, there was no proof submitted to the jury meriting a conviction on the conspriacy charge.

Applicable law gives to the Superintendent of Liquor Licenses and Control carte blanche discretion in selecting the recipients of the "quota" of new licenses available each year. A.R.S. § 4–206, subsec. G. During the calendar year 1963, the statute permitted, but apparently did not require ("* * * may be issued * * *") additional licenses not to exceed 5 per cent of the total number of each class of such license issued and in effect within the particular county as of December 31, 1961. A.R.S. § 4–206, subsec. G. The statutes do not provide for a hearing at which various applicants may be given the opportunity to establish better entitlement, nor, in fact, do the statutes give any standard upon which the superintendent is to render his decision as to which applicants are to receive any one of the new licenses authorized by law. A.R.S. § 4–205.02. The testimony indicates that for 1963 there was a "quota" allowed by the subject statute of eleven new licenses in Pima county and that there were approximately thirty-five applicants for these eleven licenses.

Under these circumstances, it seems clear that these defendants, Bowling and Cook, or any other person, could have recommended to Mr. Duncan the issuance of a license to any particular applicant, for any legitimate reason, without violating criminal law, and, in fact, this is not disputed by the State in this action. But the State contends that the acceptance of the $4,200 renders that which would otherwise be legal conduct into a perversion or obstruction of justice and/or due administration of laws. No pertinent authority is cited.

■ We see no justification for characterizing the defendants' conduct as a perversion or obstruction of "justice or due administration of laws," assuming that these concepts are made sufficiently definite by reference to the common law. The act charged as to which there was alleged to have been a conspiracy was the obtaining of the license for Hanson. The selection of Hanson by Duncan for the receipt of one of the quota licenses was not, in and of itself, a "malfeasance" or a "nonfeasance" nor a failure to perform "official obligations." (In the language of *Lorenson*.) The conduct of the defendants simply does not fit the charging language in count one of the indictment. Any conspiratorial conduct of the defendants, if criminal at all under the then existing law, most closely approached being a conspiracy to violate a bribery statute,[7] a charge not made, nor, as we shall see, supportable in the evidence. The fact that conduct may be highly reprehensible in the eyes of the courts does not justify the court in distorting language of a criminal statute to fit the conduct. A verdict should have been directed for the defendants on count one.

We pass on to the second count, charging the acceptance of a bribe by a legislator as proscribed in A.R.S. § 13–286, reading as follows:

"A member of the legislature who asks, receives or agrees to receive a bribe upon an understanding that his *official* vote, opinion, judgment or action shall be influenced thereby, or shall be given in any particular manner, or upon any particular side of a question or matter upon which he may be required to act in his *official capacity,* or casts, or

---

7. A.R.S. § 13–331 makes it a crime to conspire to "commit *any* crime." (Emphasis added)

offers or promises to cast, an *official* vote in consideration that another member of the legislature will cast such vote, either upon the same or another question, shall be punished by imprisonment in the state prison for not less than one nor more than fourteen years." (Emphasis added)

The appellants contend that there is a complete absence of any proof that there was any understanding, that the *"official vote, opinion, judgment or action"* of these defendants would be influenced by the monies received as established in this record. A leading case in Arizona in this area of our law, State v. Hendricks, 66 Ariz. 235, 186 P.2d 943 (1947), quotes with approval from 1 Burdick, Law of Crime § 291, as follows:

> " 'The act intended to be influenced must be connected with one's official or public duty, although the duty may possibly arise only in the future, but if the act is associated with official duty, it is immaterial whether the bribed person has, or has not, authority to do that specific thing, since the essence of the crime is the fact that he agreed to do it under color of office.' "

66 Ariz. at 242, 186 P.2d at 947.

The court in *Hendricks* proceeded to expound on this requirement as follows:

> "The rule requiring that the matter in which the bribe is attempted be related to the officer's duty before it can be a crime, is a wise one. The possible perversion of justice is the touchstone and guide. And though it might be morally improper and may well involve some other crime to give or offer money to an officer to do an act totally unrelated to his job, it would not be bribery."

66 Ariz. at 242, 186 P.2d at 948.

In *Hendricks,* monies paid to induce the highway patrolman to refrain from referring travelers on a state highway to local law-enforcement officers was held to be a bribe. The court examined applicable statutes to conclude that highway patrolmen are " * * * peace officers for the purpose of enforcing the laws relating to the use of highways * * * " (§ 66–701 A.C.A. 1939) and that there is " * * * an actual relation * * * " between the " * * * officer's official duties * * * " (66 Ariz. at 241, 186 P.2d 943) and the referring of travelers on the state highways, who complain of a gambling establishment fronting on the highway, to appropriate law-enforcement officials. We see a "color of office" in *Hendricks* which is lacking here.

No statute has been called to our attention which in any way suggests that a legislator has a duty to solicit liquor licenses before the Superintendent of Liquor Licenses and Control. Under our statutes, there is little connection between a member of the lower house of our legislature and this licensing agency. The Superintendent is appointed by the Governor of this State with the advice and consent of the State Senate and it is only the Governor who may remove him, subject to review in the court. A.R.S. § 4–111. That there is an inherent impropriety in the defendants' solicitation, however, is apparent when it is remembered that they made no disclosure to the Superintendent that they were appearing before him for remuneration and that as legislators they had some control over his salary, A.R.S. § 4–111, and over all monies expended by his department. Ch. 1, Tit. 35, A.R.S.

We accept the proposition, urged by the State, that the official duties of a public officer need not be prescribed by statute but may be imposed by regulation or by usage and custom. Cited decisions, such as United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1913), Daniels v. United States, 17 F.2d 339 (9th Cir. 1927), Cohen v. United States, 144 F.2d 984 (9th Cir. 1944), so hold.

*Birdsall* and *Cohen* both involved attempts to influence a recommendation to be made by a government employee, and hence bear the most resemblance to the problem at hand here. In *Birdsall* it was held that an attorney could be convicted of bribing

a special officer of the Office of Indian Affairs to make a recommendation of clemency in regard to the lawyer's clients, who had been convicted of violating criminal law proscribing sale of liquor to Indians. The Court said:

> "To constitute it official action, it was not necessary that it should be prescribed by statute; it was sufficient that it was governed by a lawful requirement of the Department under whose authority the officer was acting (Rev.Stat. § 161, U.S. Comp.Stat. 1901, p. 80; Benson v. Henkel, 198 U.S. 1, 12, 49 L.Ed. 919, 922, 25 Sup.Ct.Rep. 569; Haas v. Henkel, 216 U.S. 462, 480, 54 L.Ed. 569, 577, 30 Sup.Ct.Rep. 249, 17 Ann.Cas. 1112). Nor was it necessary that the requirement should be prescribed by a written rule or regulation. It might also be found in an established usage which constituted the common law of the Department and fixed the duties of those engaged in its activities."

34 S.Ct. at 514.

> "For this reason, if for no other, it was within the competency of the office [Indian Affairs] to establish regulations, and practices having the force of regulations, that all persons employed in its work should render to the Commissioner whenever requested *true reports and give disinterested and honest advice upon the facts known to them with respect to the advisability of showing leniency to convicted violators of the law.*"

(Emphasis added) 34 S.Ct. at 516.

In *Cohen*, the Court held that an appeal agent to a local draft board could be bribed to advise the local draft board to recommend to the War Department a furlough for an inductee. The Court referred to memoranda issued by the National Headquarters of Selective Service System indicating that there was a " * * * duty of cooperation between civil and military authorities * *" (144 F.2d at 986–987), to a " * * * history of local board recommendation of such furloughs to the War Department" (144 F.2d at 987) showing that " * * * us-

ages of the Selective Service System required the board to grant its advice in compliance with the army's demand" (144 F.2d at 987), and to the Selective Service Regulations, paragraph 603.71, indicating that the appeal agent had a duty to investigate and report to the local draft board on matters such as the furlough recommendation sought to be influenced (144 F.2d at 987).

In these cases we see proof that is lacking here. In order to satisfy the requirements of these cases, we believe there would have to be substantial proof that there was a custom or usage for legislators to make fair and impartial—and hence "official"—recommendations to the Superintendent of Liquor Licenses and Control as to which applicants should receive an available license.

Apparently realizing a deficiency in this regard, the prosecuting attorney elicited from the witness Hanson the following testimony:

> "Q I believe you testified before the jury went out that you were familiar around 1963 of the habit, custom and tradition here in Pima County for applicants obtaining licenses out of Mr. Duncan's office; is that correct?
>
> "A Yes.
>
> "Q What is that habit, custom and usage, sir? What was it at that time?
>
> "A Going through a legislator to obtain one.
>
> "Q In what capacity did you have to go through a legislator?
>
> "A Money."

The foundation for this testimony was that Mr. Hanson was acquainted with 90 per cent of the bar owners in Tucson; that he had been on a board of directors and a member of the Retail Liquor Dealers Association; and that he knew from "hearsay" that it was customary to go through a legislator to get a liquor license. There was no other evidence of similar import. The proof presented leaves one with the innuendo that it is customary for legis-

lators to accept money to do exactly what the defendants did in this case. However, Hanson was unable to give the name of any other legislator who had ever acted similarly and professed to know, without giving any names, only four other instances when a license had ever been secured through a legislator.

This proof, we hold, fails to close the gap in the establishment of criminality in two respects. First, the proof submitted in no way tends to prove that there was an obligation under any custom or usage for the legislator to make a good faith recommendation on the merits of the issuance of liquor licenses. Absent this, it is our belief that the purported custom only tended to show conduct of other legislators equally unsavory, but equally outside of the "official" duties of legislators.

Secondly, we do not believe that the testimonial qualifications of Hanson were such as to establish in sufficient probative force a custom and usage so as to predicate a conviction in a criminal court thereon. Generally, proof of custom is said to require "clear and satisfactory" evidence. 55 Am.Jur. Usages and Customs § 56, p. 316; 25 C.J.S. Customs and Usages § 33d, pp. 175–181; 32 C.J.S. Evidence § 546(76), p. 298. Also see 2 Wigmore, Evidence § 379 (3d ed. 1940), p. 316. The testimony of Hanson as to this "custom and usage" fails to rise above common gossip. We hold this unsupported testimony to be insufficient to meet the standard above expressed.

In attempting to show the inapplicability of the bribery statute to the subject conduct, the appellants ask in their brief:

"Would they violate the statute by accepting remuneration for a speaking en-gagement on behalf of a local candidate for office? How about a legislator-attorney who represents a property holder on a variance before a local zoning board? Or a legislator-physician who accepted a free dinner to speak for or against medicare?"

While we can see a distinction in degree of impropriety between these postulated activities of a legislator and that presented here, we are of the opinion that the subject statute draws no discernible line separating this type of concededly noncriminal conduct from that sought to be punished as a felony in this action. That the legislature has the power to delineate for punishment the type of conduct under consideration is not the question before us,[8] but rather whether it had done so at the time of the commission of these acts. We hold that it had not.

The decision reached here we believe to be in accord with all case law called to our attention. The State has cited no decision holding similar "influence peddling" by a legislator to be a violation of a bribery statute. State v. Nadeau, 81 R.I. 505, 105 A.2d 194 (1954), held that a city councilman could not be bribed to favor a particular candidate for appointment to the city police force, because appointments to the city police force under pertinent law were within the authority of a board of police commissioners, of which the city councilman was not a member and over which he had no control. State v. Hibicke, 263 Wis. 213, 56 N.W.2d 818 (1953), holds that a police constable could not be bribed to recommend to a town council the issuance of a trailer-camp license to a particular applicant because the making of such recommendation was not a part of the constable's "duty in law

---

8. We note in passing that the Twenty-eighth Legislature adopted as Ch. 18 of its First Regular Session Laws a new Article 12 to Ch. 7 of Tit. 41, A.R.S., dealing with the subject of "ethics" of members of the legislature. Subsection 4 of new section 41–1291, A.R.S., pertaining to the acceptance of compensation for services rendered in relation to any matter or proceeding pending before a state agency, would appear to pertain to conduct similar to that charged herein. By this new legislation, a violation of this subsection is made punishable by imprisonment for not more than ten years, by a fine of not exceeding $10,000, or both. A.R.S. § 41–1297.

enforcement." (56 N.W.2d at 820). People v. Leve, 309 Mich. 557, 16 N.W.2d 72 (1944), held, under a similar statute, that it was reversible error to instruct a jury that a conviction might lie if the defendant had agreed that "his vote, opinion or judgment *or 'influence'*" (emphasis added) be given in any particular manner. The court said:

"In the instant case the statute provides for vote, opinion or judgment. It does not make it a crime to use influence." 16 N.W.2d at 75.

For the reasons expressed herein the judgment is reversed and judgment of acquittal as to both counts is ordered to be entered as to both defendants.

HATHAWAY, C. J., and KRUCKER, J., concur.