[Civil No. 4565.   Filed July 14, 1944.]

[150 Pac. (2d)  761.]

RIDARA LIVESTOCK COMPANY, a Corporation, Appellant, v. AGRICULTURAL PRODUCTS COMPANY, a Corporation, Appellee.

Mr. Mark Wilmer, for Appellant.

Messrs. Woolf & Shute, for Appellee.

FAIRES, Superior Judge.—This action and appeal grows out of a purchase and sale contract dated the 16th day of October, 1940. The complaint alleges that defendant agreed to sell and plaintiff agreed to buy from defendant 100 tons of cottonseed meal at a price of $23 a ton; that defendant on or about the 15th day of August, 1941, breached its agreement in that it refused to sell or deliver further cottonseed meal to plaintiff without justification or excuse; the complaint further alleges that after notifying defendant of its intention to purchase the balance of said meal on the open market, plaintiff bought the same at prices substantially above the contract price.

In its amended answer the defendant pleaded several defenses, one of which is that the refusal is based upon a claimed mutual cancellation of a portion of the contract. Another defense, that the contract was cancelled by defendant because of plaintiff's refusal to pay a draft on presentation for the amount due and unpaid for products delivered to plaintiff under the contract during the months of July and August, 1941. Other grounds, both affirmative and defensive, set up in the amended answer, we do not need to recite or consider in the determination of the legal principles here involved.

Appellant, Ridara Livestock Company, a corporation, hereinafter called plaintiff, appeals from a judgment based upon a directed verdict rendered against it in the superior court of Maricopa County in favor of appellee, Agricultural Products Company, a corporation, hereinafter called defendant.

▪ ██ It is fundamental that the construction of a contract is for the courts when its terms are plain and unambiguous on its face. 13 C. J. 783; 17 C. J. S. Contracts, § 616. However, it is equally well settled that if there are ambiguities in the contract, and it is necessary to take into consideration the surrounding facts and circumstances in determining its meaning, it is for the jury to determine what those facts and circumstances were; when the facts are once established it is for the court to decide the legal meaning thereof. *Kreig* v. *Hammels,* 29 Ariz. 280, 240 Pac. 1031; *Carrick* v. *Sturtevant,* 28 Ariz. 5, 234 Pac. 1080.

██ A judgment predicated on a directed verdict must be affirmed on appeal if any of several grounds of the motion for such verdict are good, if the result is the only one that could be reached legally. *Horan* v. *Richfield Oil Corp.,* 56 Ariz. 64, 105 Pac. (2d) 514, and authorities cited thereunder.

██ It is fundamental that in passing upon the propriety of an instructed verdict all evidence favorable to the party against whom the verdict is directed and all reasonable inferences to be drawn therefrom must be taken as true. An examination of the evidence discloses that on April 9, 1941, the defendant corporation wrote Mr. B. A. Randall, one of the owners of the plaintiff corporation, as follows:

"Dear sir:

"Pursuant to our conversation of April 7th, I am advised by Mr. E. W. Hudson that you have 40 tons of cottonseed meal left on your original contract.

"Some few weeks ago when you were in Phoenix and had a talk with Mr. Hudson concerning the undelivered balance of meal on your contract at that time and Mr. Hudson now advises me that your and his agreement then was you would only need 40 tons of meal to complete your needs and Mr. Hudson promptly sold all over that amount that you had left.

This 40 tons we are reserving for delivery to you according to the terms of your original contract.

"Yours very truly,

"Agricultural Products Company

"By E. M. Cooper."

Mr. Randall testified in this connection as follows:

"Q. I believe you testified before . . . that you received that letter, Mr. Randall? A. It was a letter of that nature, yes.

"Q. What, if anything, did you do after you received that letter? A. I took the letter and went over to the oil mill and contacted Mr. Hudson personally about the matter.

"Q. Do you recall how long it was after you received this letter that you went to see Mr. Hudson? A. Well, no. I wouldn't say immediately but it was in the next day or two after receiving the letter.

"Q. Where did you find Mr. Hudson? A. He was there at the office.

"Q. At his office? A. Yes.

"Q. Did you have a conversation with him there? A. I did.

"Q. Who was present at the conversation? A. Mr. Hudson was, and Mr. Cooper was there.

"Q. Will you state what was said by you and what was said by Mr. Hudson? A. I took the letter and went in and asked Mr. Hudson what it was all about; that I had not authorized a cancellation of any meal whatsoever; that I didn't understand why he had written a letter of that nature, and we went on talking and Mr. Hudson got kind of angry because I had come in and tried to make me believe that he had understood me to say I had told him to cancel some of it off.

"Q. Do you remember what he said? A. Well, at the end of the conversation he said, and that was after we left his room and went in where Mr. Cooper was, and Mr. Hudson asked Mr. Cooper personally if there was anything to show on our books of any meal cancelled off, and Mr. Cooper got the books out and looked at the books, and Mr. Hudson looked at

the books, and there was nothing whatsoever to show any meal had been cancelled off, and Mr. Hudson jokingly said before I left. 'Well, go ahead and get your forty tons, and if you want any more come in and bellow like a calf.' I remember those words very distinctly.

"Q. Then later did you have any further conversation with him as to this matter? A. Not until he refused the meal.

"Q. Did you at any time, Mr. Randall, tell him that it was agreeable with you or the Ridara Livestock Company that your meal contract be reduced or cancelled? A. None whatsoever."

The evidence further discloses that the witness Randall had a conversation in March of 1941 with Hudson, the substance of which was to the effect that he had cattle on the desert and they had good prospects of getting fat. And at that time, he, Randall, couldn't tell whether he would need all the meal under the contract or not. And that a short time later and prior to the receipt of the letter hereinabove set out he had talked to the witness Hudson about whether the balance of meal undelivered on the contract could be sold by Randall under the advancing market which at that time, according to Randall, was $28. That he was refused so to do by Hudson. In this connection the following questions and answers given by the witness Randall on cross examination:

"Q. You say the market in March was $28? A. It was $28 when I was in and saw Mr. Hudson at that time.

"Q. When this 55¼ tons was cancelled out, is that your position? A. There was none cancelled, absolutely.

"Q. Shown by the contract here? A. The contract was never shown me of any cancellation during that period of time of the existence of the deal."

The evidence further shows that at the time Randall received the letter of April 9, 1941, the market

price then was advancing and continued to advance up until August 26, 1941, when notice of cancellation of said contract was made by the defendant, which appears on Defendant's Exhibit No. 3 in evidence, as follows:

"August 26, 1941

"The within contract is cancelled at 12 o'clock noon this day because of Buyer's refusal to pay our draft of August 26, 1941, presented during forenoon of to-day by Valley National Bank, Mesa Branch, to Buyer for the amount due and unpaid for products delivered to Buyer on this contract.

"Agricultural Products Company
"By E. W. Hudson."

In the forepart of August, 1941, there was still an undelivered balance of approximately 50 tons. The price of meal in the open market had advanced to around $36 per ton on the date of cancellation of contract by the defendant. The evidence further shows that the plaintiff had been taking meal under the contract through the spring when monthly statements would be rendered and paid on varying dates during the succeeding month. At the time cancellation notice was given plaintiff by the defendant the buyer was in arrears for July and part of August. It appears that this course of dealing had been satisfactory to the parties until about the middle of August when an employee of the plaintiff buyer, who had been sent for meal, returned with the information that the defendant had refused to furnish further meal.

There is testimony by the witness Randall that he drove to the office of defendant following the receipt of this information and demanded compliance with the contract by further deliveries of meal, which was refused, the explanation offered being that defendant had sold the undelivered meal on the contract to the Tovrea Packing Company, under the authority of oral

modification April 7, 1941, made by Randall with Hudson, president of the defendant corporation. The plaintiff thereupon demanded performance of the contract on the part of the defendant, and the defendant failing to comply with this demand the plaintiff thereafter did purchase meal on the open market to cover the balance alleged due under the contract, following which this suit was filed.

While the testimony covering the events immediately preceding and following the presentation of the drafts referred to in the cancellation notice of August 26, 1941, is sharply in conflict, yet there is testimony in the record that the witness Gail Dana, one of the officers of the plaintiff corporation, upon notice being given by the bank teller of the draft, requested time to look into the matter and neither accepted nor refused to accept the draft. In this connection Dana testified he called the witness Hudson, President of defendant corporation, and explained to him why he did not choose to accept the draft and inquired if the plaintiff might not pay the account by check. To this the defendant agreed, according to the witness Dana, though denied by Hudson, and a check was mailed that afternoon to defendant and received shortly thereafter. Following this conversation Dana testified he called the bank and informed the teller that he had made arrangements with the defendant corporation, through Hudson, to send a check instead of letting the draft go through.

It is apparent from the record that the defendant corporation relied upon the following Rules of the National Cottonseed Products Association, which we quote in part:

"Rule 1. . . . Members are entitled to make contracts for the purchase and/or sale of their products to and from non-members, subject to the rules of the National Cottonseed Products Association, Inc."

It is admitted that the seller corporation is a member of the association, while the plaintiff buyer is not a member thereof.

"Rule 4. *Payment.* All sales, unless otherwise specified in the memorandum of sale, or under these rules, will be for cash. . . . "

"Rule 206. *Product at Destination.* Sec. 1. Refusal on the part of buyer to pay draft. When products other than oil or soap-stock have been shipped, and drafts properly drawn with documents attached, as contemplated by these Rules, it will be the duty of buyer to pay draft on presentation. Upon buyer's failure to so pay such draft, seller will have the option to treat the contract as breached by the buyer; . . . ."

Rules 210, 212 and 213 merely outline procedure after default.

This contract was upon a mimeographed form prepared by defendant, into which the amount of the contract and certain other information was inserted by defendant, and the contract was mailed by defendant to plaintiff for execution by it. Across the top of the sheet there appears the following mimeographed statement, "The following sale, made subject to the *Rule* of the National Cottonseed Products Association, Inc., is hereby affirmed." It may be observed in this connection that the record clearly demonstrates that "Rule" in the singular was a typographical error and intended to be in the plural. Other mimeographed and typewritten terms appeared therein and the contract was signed by the parties.

In plaintiff's assignment of error No. 1 it is claimed that the court erred in granting defendant's motion for a directed verdict upon the ground that no contract existed between the parties by reason of the fact that the Rules of the National Cottonseed Products Association were not agreed to by plaintiff and defendant as part of the contract.

No. 2. That the court erred in granting defendant's motion for an instructed verdict on the ground that if the Rules were a part of the contract, then plaintiff had failed to conform to the requirements of said Rules in fixing its damages.

No. 6. That the court erred in denying plaintiff's motion for a new trial for the reason that under the law and facts plaintiff was entitled to have the issues as made by its complaint and defendant's amended answer submitted to the jury for determination by it.

■■ The record is clear with reference to the part Rules played in the contract negotiations. Plaintiff's witnesses testified that they had never been brought to their attention. That neither plaintiff nor defendant discussed the Rules or made any reference to them in their contract negotiations is not disputed. That neither party paid any attention to them after the contract was in process of execution. That rules as to delivery, payment, ordering, all were ignored by both parties. No reference was made by defendant in its cancellation notice of any Rule or Rules which the plaintiff had not complied with but the notice based cancellation upon buyer's failure to pay the draft of August 26, 1941.

Now the question arises, was there a meeting of minds of the parties as to the essential terms of the contract? Here we have rules which are alleged to be part of the contract which were ignored in their dealings by both parties. Never discussed either before the contract was entered into or after cancellation thereof. It is not within our province to determine whether or not the Rules were part of the contract, but whether under the rule of most favorable light being given the testimony of the plaintiff's witnesses the case should not have been submitted to the jury. The true rule is well stated in 64 C. J. 488, as follows:

" . . . A trial court cannot properly direct a verdict, and acts properly in refusing a motion for that purpose, even though the court would have drawn from the testimony a conclusion different from that drawn by the jury, where the evidence is not so conclusive that all reasonable men in the exercise of an honest judgment can draw but one inference or conclusion therefrom, but is such that fair minded and intelligent men, acting reasonably, can reach different conclusions as to the inference, deductions, or conclusions therefrom; . . . ."

At the conclusion of the evidence the court directed a verdict as follows:

" . . . The Court is of the opinion that these Rules that you have heard of, and they were introduced here, and I have read, play a great part in this lawsuit. Either the parties did or did not agree on these rules. If they didn't agree on these rules, that is, making these rules a part of the contract, then there never was a contract. If they did make these rules a part of the contract then the plaintiff in this case has not followed the rules and he cannot recover. That is the opinion of the Court, gentlemen, so the motion for directed verdict is granted."

We have examined all of the authorities contained in defendant's brief. This opinion would be needlessly extended should we attempt to review and distinguish them.

In view of our conclusions, based upon plaintiff's assignments of error Nos. 1, 2 and 6, it is unnecessary to pass upon remaining assignments as to their sufficiency under the Rules of Court, which assignments were specifically challenged by the defendant on this ground.

We have made a careful examination of the record and conclude that the evidence shows that there were issues of fact presented, which should have been submitted, under proper instructions, to the jury.

The judgment is reversed and the cause remanded for a new trial.

McALISTER, C. J., and ROSS, J., concur.

NOTE: Due to the absence of Judge R. C. STANFORD from the state, the Honorable C. C. FAIRES, Judge of the Superior Court of Gila County, was called in to sit in his place and stead.