429 P.2d 686

**ARIZONA LAND TITLE & TRUST COMPA-NY, as Trustee under Trust No. 6179–T, Appellant,**

v.

**SAFEWAY STORES, INC., a Maryland cor-poration, and Arizona Land Title & Trust Company, as Escrow, Appellees.**

No. 2 CA–CIV 334.

Court of Appeals of Arizona.

July 5, 1967.

Rehearing Denied Sept. 8, 1967.
Review Denied Oct. 17, 1967.

S. Leonard Scheff, Tucson, for appellant.

Snell & Wilmer, Phoenix, by Arthur P. Greenfield and Maynard P. Goudy, Phoenix, for appellees.

MOLLOY, Judge.

This appeal arises from a summary judgment rendered for the defendant-buyer (Safeway Stores) in an action brought on a contract for the sale of real estate, in which the seller sought specific performance and damages. The problem presented here is one of the construction of the verbiage contained in the written contract of sale.

The conflict centers upon whether an express condition precedent in the contract had occurred. The key word in this controversy is "purchase." According to the seller-plaintiff, this word denotes, in the context of this particular contract, the entering into a contract of purchase, while the buyer-defendant maintains that the word denotes acquisition of title to property purchased.

The written agreement to be construed in this action was entered into on July 1, 1964, and granted to the buyer, Safeway Stores, an option to purchase certain real estate belonging to the seller upon certain terms and conditions. The agreement is on a form contract prepared by Safeway. Pertinent portions of this agreement read as follows:

"FIRST: That in consideration of the payment to Seller of the sum of One Hundred and No/100 `---------------` DOLLARS ($100.00), receipt of which is hereby acknowledged, the Seller hereby grants unto the Buyer the exclusive right and option to *purchase*, at any time on or before the 30th day of September, 1964, for the sum of Two Hundred Five Thousand and No/100 `-------------` DOLLARS ($205,000.00), that certain property, * * *.

* * * * * *

"FIFTH: Upon Buyer's exercise of this option as provided for in paragraph SECOND hereof, this agreement shall constitute a *contract for the purchase* of the property described in paragraph FIRST hereof, upon the following terms and conditions:

* * * * * *

"H. Buyer agrees, *on completion of the escrow and Buyer's acquisition of title to the property,* to pay a real estate brokerage commission in the amount of Ten Thousand Two Hundred Fifty and NO/100 DOLLARS ($10,250.00), to

[Here was given the name and address of the real estate broker involved.]

"I. Seller has been informed that Buyer's agreement to purchase the property described in paragraph FIRST hereof is conditional upon Buyer's *purchase,* upon terms satisfactory to Buyer, of adjacent property described as follows:

Lots 4, 5, 8 and the West 200 feet of Lot 9, in said Block 4, Speedway Addition No. 1.

"Buyer shall have such period of time as shall be necessary to accomplish *the purchase* of said adjacent property provided Buyer proceeds with diligence appropriate to the circumstances. The time for the *completion of the purchase* of Seller's property and for the closing of the escrow shall be automatically extended without further action by Buyer until such time as Buyer has *completed* the purchase* of said adjacent property or has notified Seller in writing that Buyer has abandoned Buyer's attempt to *complete the purchase* thereof." (Emphasis added)

At approximately the same time as the instant contract was executed, the buyer entered into three other written option agreements, on the same form contract as the one before the court for construction, as to all of the properties described in subparagraph "I" above. All options to purchase, including that contained in the contract now before us for construction, were exercised in the latter part of October, 1964, the various sellers having extended the option periods to incude the dates of such exercises of option.

In connection with one of the properties included within subparagraph "I", hereinafter referred to as the St. Pierre property, there was a delay resulting from various factors, among which was a necessity of securing an order of court approving the sale, inasmuch as an interest in this property was vested in minors. On January 11, 1965, an order of confirmation of sale as to the St. Pierre property was secured and on January 12, 1965, all appeared in readiness to close the four transactions, which were all escrowed for closing of sale at the same title company.

However, before authorizing the payment of the purchase price, which had been delivered over to the escrow agent by the buyer, an agent of Safeway went personally to the St. Pierre property. He testified he was there informed by a lady, not a signatory to the buyer's contract of purchase, that she had been in possession of the property since 1935 and that she claimed a life tenancy therein. This person is referred to in the briefs filed herein as "Aunt Lucy Teach."

Inquiry was made by Safeway of the persons who had contracted to sell to it the St. Pierre property as to the nature of Aunt Lucy Teach's interest in the property and no answer was ever received, though Safeway continued to be ready to close the purchase for a period of six months. Two title companies involved in the closing of these transactions declined to insure title as against the possessory rights of Mrs. Teach. At the end of six months, the buyer again checked the property, and, finding Mrs. Teach still on the property, gave written notice of termination of all four contracts of purchase.

It is the seller's contention that the condition expressed in subparagraph "I" of the contract occurred at the time the buyer exercised its options and entered into *contracts of purchase* as to all of the properties described in said subparagraph; it is the buyer's contention that the condition precedent expressed in said subparagraph has never been satisfied in that Safeway has never *acquired title* to any of the properties described therein. Both parties filed a motion for summary judgment in the trial court; the trial court granted the motion of the defendant-buyer and entered written judgment accordingly.

■ Though the parties hereto construe its language in a different way, all agree that subparagraph "I" of the subject contract expresses a condition precedent to the obligations of the buyer thereunder. An express condition precedent to contractual obligations must be enforced according to its terms, without regard to the harshness of the condition:

"Since an express condition, like a condition implied in fact, depends for its validity on the manifested intention of the parties, it has the same sanctity as the promise itself. Though the court may regret the harshness of such a condition, as it may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the parties unless to do so will violate public policy."

5 Williston on Contracts § 669, p. 154 (3d ed.).

See also § 675, p. 184. A court will not remake a contract for the parties. Graham County Electric Coop., Inc. v. Town of Safford, 95 Ariz. 174, 388 P.2d 169 (1963).

■ Both parties contend that the meaning of the troublesome language is crystal-clear. We do not find such to be the case. We agree with the California Supreme Court that:

"The words 'purchase' and 'sale' in a contract do not necessarily connote an executed or consummated purchase or sale, but are frequently used in the sense of an agreement to buy or sell. 23 R.C.L. 1347, § 171. The interpretation of these terms in any particular case is controlled by the context of the writing, and the whole instrument must be examined."

Universal Sales Corp. v. California Press Mfg. Co., 20 Cal.2d 751, 128 P.2d 665, 675 (1942).

The word "sale," the antonym of the word "purchase," has been declared by our Supreme Court to refer to a contract of "sale":

"Such being the case, a judgment decreeing specific performance is not even a 'sale,' let alone a 'forced sale.' *The 'sale' was made at the time the agreement to sell was executed.* The court merely enforces the transfer of the legal title for the purpose of giving notice to third parties as to what the actual rights of the parties are. As between the latter, the equitable title has already passed." (Emphasis added)
Strahan v. Haynes, 33 Ariz. 128, 140, 262 P. 995, 999 (1928).

At least in one provision of the subject contract, the word "purchase" was unquestionably used in the sense of a *contract* of purchase. This is in that action thereof setting up the option of purchase:

" * * * the Seller hereby grants unto the Buyer the exclusive right and option *to purchase,* at any time on or before the 30th day of September, 1964 * * *."
(Emphasis added)

It is admitted by both parties that the only thing required of the buyer on or before September 30, 1964, under the subject contract, was to give notice of exercise of option, thus indicating that *the purchase* would occur when the contract to buy thus came into existence.

The seller also points out that in other places in the agreement, when the actual acquisition of title is intended, other verbiage is used, such as in subparagraph "H," quoted above in this opinion, which provides that the real estate commission will be paid " * * * on completion of the escrow and Buyer's acquisition of title * * *."

In subparagraph "I" there is language which Safeway contends is conclusive of the problem of construction:

"Buyer shall have such period of time as shall be necessary to accomplish the purchase of said adjacent property provided Buyer proceeds with diligence appropriate to the circumstances. The time for the completion of the purchase of Seller's property and for the closing of the escrow shall be automatically extended without further action by Buyer until such time as Buyer has completed the purchase of said adjacent property or has notified Seller in writing that Buyer has abandoned Buyer's attempt to complete the purchase thereof."

Under the buyer's interpretation of the foregoing, it was given an open-end extension of time to close the purchase of seller's property which extension will never terminate because the buyer did not complete the purchase of the adjacent property upon terms "satisfactory" to the buyer. This is one possible construction, and, if the correct one, indicates a very one-sided agreement under which the seller has no enforceable contract until actual closing of the contracts negotiated by the buyer with several third persons and under which the seller's valuable real estate is "tied up" for an indefinite time for a token down-payment of $100. The seller advances what appears to be, without full knowledge of all surrounding circumstances, a fairer and hence a more reasonable, 17A C.J.S. Contracts § 319, p. 188 et seq., 17 Am.Jur.2d Contracts § 252, pp. 644–46, construction. It is seller's contention that under the quoted language, the time to close is "extended" so long as the buyer is proceeding with " * * * diligence appropriate to the circumstances" to attempt to close the purchase of the other properties. Once this *extension* has expired, however, and the buyer has abandoned efforts to secure the adjacent properties, it is seller's contention that the buyer would be obligated to proceed with the purchase of the seller's property.

■ If we have nothing more than the four corners of this document to guide us, we would be constrained to accept the seller's interpretation. This is so because this is a contract in which the verbiage was selected by the buyer. Hamberlin v. Townsend, 76 Ariz. 191, 261 P.2d 1003 (1953); Restatement, Contracts § 236(d),

p. 328. However, this rule of construction is regarded by the Restatement of Contracts as a "secondary" rule of construction to be applied only if the meaning of an agreement remains uncertain after the application of primary standards of interpretation. See Restatement, Contracts § 236. The *Hamberlin* decision itself indicates that this rule is to be used "* * * only if a satisfactory result cannot be reached by the other rules of construction." (76 Ariz. at 196, 261 P. 2d at 1006, quoting from 17 C.J.S. Contracts § 324.)

■■ We are thus presented with the problem of what "other rules of construction" should be applied and whether, on the basis of facts presented on the motions for summary judgment, this contract was sufficiently clear to render a summary judgment for either party. We first note that it is not proper to cut off trial by granting a motion for summary judgment if there is any substantial doubt as to the critical facts. Peterson v. Valley National Bank of Phoenix, 90 Ariz. 361, 368 P.2d 317 (1962).

■ If circumstances prior to and surrounding the execution of this contract are pertinent, then there is much lacking in the record presented. Affidavits and depositions do not touch upon anything said or done prior to or at the time of the making of this contract. Nor do we even have the physical layout of the various properties concerned before us, which we conceive might shed some light on whether the parties may have contemplated a sale of the subject property separate from the adjacent property under certain limited circumstances. Nor do we know whether there are any local usages of terminology that might cast light upon the meaning of this contract. Are these proper matters to be considered? We believe so.

Even as to integrated contracts which are *not* ambiguous, the Restatement of Contracts requires that they be interpreted in the light of operative usages and surrounding circumstances:

"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person *acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration,* other than oral statements by the parties of what they intended it to mean." (Emphasis added)

Restatement, Contracts § 230, p. 310.

The Willistonian view expressed above is the "primary" rule of interpretation of the *Restatement.* See 4 Williston, ch. 22 and especially §§ 607, 609, 617, 618 and 629 (3d ed.). Under this view, the surrounding circumstances of a contract may *always* be considered in construing a contract:

"4. The circumstances under which a writing was made may always be shown. The question the court is seeking to answer is the meaning of the writing at the time and place when the contract was made; and all the surrounding circumstances at that time necessarily throw light upon the meaning of the contract." 4 Williston on Contracts § 618, pp. 716–17 (3d ed.).

■ Our own Supreme Court has generally taken the view that "parol evidence" may only be admitted to explain a contract when there is an ambiguity, Brand v. Elledge, 101 Ariz. 352, 419 P.2d 531 (1966).

Our Supreme Court has said:

"* * * parol evidence is not admissible to aid in the interpretation of the parties' intentions until the four corners of the writing itself have been searched to determine whether the document itself affords a reasonably clear understanding of what the parties have agreed to do." Richards Development Company v. Sligh, 89 Ariz. 100, 102, 358 P.2d 329, 330 (1961).

However, the Court has also said:

"The rule is well established that a court, when construing an agreement, must put itself in the position of the

parties and give effect to their intention as of the time the agreement was made." Rental Development Corp. v. Rubenstein Const. Co., 96 Ariz. 133, 136, 393 P.2d 144, 146 (1964).

This latter statement is substantially the same as Williston's primary rule of construction. See 4 Williston on Contracts § 607, pp. 378–79, ante.

The Williston text, at least, would regard any difference between the language of the *Restatement* and the many expressions of our Supreme Court that parol evidence is admissible only in the event of ambiguity to be more apparent than real:

"In regard to some of these statements, it may be inferred that the court, in denying the admissibility of evidence of surrounding circumstances to vary the meaning of an apparently clear writing, meant no more than that in the particular case the evidence offered would not persuade any reasonable man that the writing meant anything other than the normal meaning of its words would indicate and that, therefore, it was useless to hear the evidence."

4 Williston on Contracts § 629, p. 921 (3d ed.).

■ But, regardless of any difference in this regard, our Supreme Court has been consistent in holding that when there is an "ambiguity" such as we believe there exists in the case of this contract, evidence *aliunde* the record is admissible to shed light upon the intentions of the parties. Brand v. Elledge, supra; Crone v. Amado, 69 Ariz. 389, 214 P.2d 518 (1950). Here, we have an ambiguity, but no parol evidence to assist in resolving it.

■ Though both parties have filed a motion for summary judgment, this does not constitute a stipulation that all pertinent facts are before the court:

"The function of a motion for summary judgment is analogous to that of a motion for directed verdict. Although all parties move for directed verdicts that does not warrant the court in withdrawing the case from the jury if there is any genuine disputed issue of fact.

"A parallel principle is applicable to the summary judgment procedure. The well-setted rule is that *cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.*" (Emphasis added)

6 Moore's Federal Practice ¶ 56.13, p. 2092.

Were we to assume that there are no surrounding circumstances to assist in the interpretation of this contract, we have already indicated that we would accept the interpretation of the seller as to the key phrase selected for litigation here. But, even if this assumption be made, this would not mandate judgment for the seller as there exists a factual issue which would have bearing upon the outcome even under this theory.

The parties have argued at great length as to the rights of Aunt Lucy Teach in the St. Pierre property. The seller's characterize her claim as a "spurious oral claim of a life estate." The buyer, on the other hand, argues that the claim of ownership by a possessor of real estate is good grounds for refusing to accept title to the property. Much of the argument is directed to this last assertion, and the provisions of the St. Pierre contract are analyzed in some detail in the briefs.

■ Whether the buyer was authorized under its contract with the St. Pierre sellers to rescind that contract we believe is not controlling here. The seller was not a party to the contracts as to the adjacent property. The verbiage of the St. Pierre contract was not adopted by reference into the contract construed here nor, as far as the record discloses, were the contents of the St. Pierre contract made known to the seller before or at the time of the execution of the subject contract. The general rule that all agreements a part of the same

transaction must be construed together is therefore not applicable. 17A C.J.S. Contracts § 298, p. 134; 17 Am.Jur.2d, Contracts, § 264, p. 668.

We are concerned here only with whether a particular condition precedent to the obligations of the buyer in this particular contract failed to occur. And this condition, under the construction resulting from ignorance of all surrounding circumstances, can be paraphrased as an if-a-contract-of-purchase-is-negotiated condition, *not* an if-a-contract-of-purchase-is-negotiated-*and*-the-buyer-does-not-default condition.

■ This construction results in a contract analogous to a contract of a real estate owner to pay a broker a commission if the broker should find a buyer on terms satisfactory to the owner. In such a situation, it is well established that the owner is obligated to the commission once a contract of purchase has been negotiated, on terms satisfactory to the owner, even though the purchaser later defaults on the contract. James v. Hiller, 85 Ariz. 40, 330 P.2d 999 (1958), and see Anno: Broker—Right to Commission, 74 A.L.R.2d, pp. 437–99. Hence, recovery on the instant contract does not hinge necessarily upon whether the St. Pierre sellers breached their contract. More pertinent is the fact that these sellers were fully ready and able to complete the terms of their own sales contract.

■ However, this does not mean that the question of Aunt Lucy Teach's interest in this property is immaterial. Implied terms of a contract are just as much a part thereof as express ones. Zancanaro v. Cross, 85 Ariz. 394, 339 P.2d 746 (1959); 4 Williston on Contracts § 610(B), pp. 532–53 (3d ed.). It seems to this court to be crystal-clear that, if the word "purchase" referred to a *contract* of purchase as to the adjacent property, it was intended to mean a contract with the owners of the fee interest in the property. Certainly no fair interpretation would conclude that the exe-

cution of a contract of purchase with strangers to the title would satisfy this condition. And if this is so, it seems equally clear that if Mrs. Teach had a life tenancy in the St. Pierre property by reason of adverse possession, or otherwise, and if she was not one of the signatory sellers under the buyer's contract in regard to the property, the buyer would not have *purchased* the St. Pierre property under any interpretation of that word.

■ As to whether Mrs. Teach's interest in the St. Pierre property is "spurious" as contended by the seller, or has validity, as impliedly contended by the buyer, the record is not conclusive. All of the evidence now before the court is of a hearsay variety, which would not control on a motion for summary judgment. 3 Barron & Holtzoff, Federal Practice and Procedure § 1237, at p. 166; 6 Moore's Federal Practice ¶ 56.22, at pp. 2327–28.

The seller also argues that the buyer in some way "waived" the occurrence of the condition precedent by rejecting the St. Pierre property only because of a "spurious" claim of ownership in a person outside of the chain of record title. We see no merit in this contention.

■ Generally, one can only waive contractual rights when there has been an intentional relinquishment of a known right. In re Brandt's Estate, 67 Ariz. 42, 190 P.2d 497 (1948). In this connection, there is no showing that the buyer had knowledge of any interest of Aunt Lucy Teach when it entered into a contract of purchase as to the St. Pierre property, nor, at any time prior to the date on which it refused to close these purchases (Jan. 12, 1965).

■ The seller also argues that the existence of this particular condition precedent was excused because the buyer prevented the occurrence of the condition precedent. However, this principle of law pertains to prevention or hindrance of the performance of a condition not to be performed by the promisor, when the promisor has no right under the contract to hinder

**60**

or interfere with such performance. See Restatement, Contracts § 295, illus. 3; 5 Williston on Contracts § 677(A), at p. 235 (3d ed.); Amies v. Wesnofske, 255 N.Y. 156, 174 N.E. 436, 73 A.L.R. 918 (1931). When the condition precedent consists of conduct to be performed *by the promisor himself*, it becomes a question of determining whether under the particular contract there is any duty on the part of the promisor to cause the condition precedent to occur:

> "Failure of a condition to exist or to occur *even though the condition is some performance by a party to the contract,* is not a breach of contractual duty by him *unless he has made an enforceable promise that the condition exists or shall occur.* Whether he has done so is a question of interpretation. (Emphasis added)
>
> \* \* \* \* \* \*
>
> *"Illustrations:*
>
> "1. A promises B to paint a landscape. B promises A to pay $1000 for the painting if B builds a house which he is then planning. B later decides not to build the house and declines to buy the painting. A has no right of action."

Restatement, Contracts § 257, pp. 366–67.

 It has not been argued here that the buyer was contractually bound to purchase the adjacent properties, and hence we see no liability under this law.

Reversed and remanded for further proceedings not inconsistent herewith.

LAWRENCE HOWARD, Superior Court Judge, concurs.

HATHAWAY, C. J., dissents.

NOTE: Judge HERBERT F. KRUCKER having requested that he be relieved from consideration of this matter, Judge LAWRENCE HOWARD was called to sit in his stead and participate in the determination of this decision.