457 P.2d 938

**SAM LEVITZ FURNITURE COMPANY,**
Inc., an Arizona Corporation, Appellant,

v.

**SAFEWAY STORES, INC.,** a Maryland Corporation, and Arizona Land Title & Trust Company, as Escrow, Appellees.

No. 2 CA–CIV 681.

Court of Appeals of Arizona.

Aug. 22, 1969.

Rehearing Denied Oct. 2, 1969.

Review Granted Nov. 18, 1969.

S. Leonard Scheff, Tucson, for appellant.

Snell & Wilmer, by Maynard P. Goudy and Arthur P. Greenfield, Phoenix, for appellees.

MOLLOY, Chief Judge.

This is a sequel to a reversal rendered by this court in Arizona Land Title & Trust Co. v. Safeway Stores, Inc., 6 Ariz. App. 52, 429 P.2d 686 (1967).[1] In this previous opinion, we decided that it was not clear whether the word "purchase" as used in this contract for the sale of real estate meant the consummation of a binding contract of purchase with the owners of three other pieces of property, or the actual acquisition of titles to these other properties.

The lines of battle are about the same on re-appeal. The seller (Levitz), under this contract, contends that a firm contract of sale came into existence when the buyer (Safeway) exercised its option to purchase the adjoining properties and Safeway contends that its purchase from Levitz was subject to a condition precedent which never occurred in that it (Safeway) never actually acquired title to the adjoining land.

 In our previous opinion, we said:

"If we have nothing more than the four corners of this document to guide us, we would be constrained to accept the 'seller's interpretation. This is so because this is a contract in which the verbiage was selected by the buyer. Hamberlin v. Townsend, 76 Ariz. 191, 261 P.2d 1003 (1953); Restatement, Contracts § 236(d), p. 328." 6 Ariz.App. at 56, 429 P.2d at 690.

In that opinion, we quoted with approval from the Restatement of Contracts as to the *primary* standard of interpretation of an integrated contract:

"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person *acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration,* other than oral statements by the parties of what they intended it to mean.' (Emphasis added) Restatement, Contracts § 230, p. 310." 6 Ariz.App. at 57, 429 P.2d at 691.

We further said:

"Were we to assume that there are no surrounding circumstances to assist in the interpretation of this contract, we have already indicated that we would accept the interpretation of the seller as to the key phrase selected for litigation here. But, even if this assumption be made, this would not mandate judgment for the seller as there exists a factual issue which would have bearing upon the outcome even under this theory.

"The parties have argued at great length as to the rights of Aunt Lucy Teach in the St. Pierre property. The seller's characterize [*sic*] her claim as a 'spurious oral claim of a life estate.' The buyer, on the other hand, argues that the claim of ownership by a possessor of real estate is good grounds for refusing to accept title to the property.

＊ ＊ ＊ ＊ ＊ ＊

"Implied terms of a contract are just as much a part thereof as express ones. Zancanaro v. Cross, 85 Ariz. 394, 339 P.2d 746 (1959); 4 Williston on Contracts § 610(B), pp. 532–53 (3d ed.). It seems to this court to be crystal-clear that, if the word 'purchase' referred

---

1. The plaintiff in the prior action was a trustee of a trust as to which the plaintiff here, Sam Levitz Furniture Company, Inc., was the sole beneficiary. Since our appellate opinion, the trust has been closed out and the interest of the seller in this contract has been assigned to Sam Levitz Furniture Company, Inc.

to a *contract* of purchase as to the adjacent property, it was intended to mean a contract with the owners of the fee interest in the property. Certainly no fair interpretation would conclude that the execution of a contract of purchase with strangers to the title would satisfy this condition. And if this is so, it seems equally clear that if Mrs. Teach had a life tenancy in the St. Pierre property by reason of adverse possession, or otherwise, and if she was not one of the signatory sellers under the buyer's contract in regard to the property, the buyer would not have *purchased* the St. Pierre property under any interpretation of that word.

"As to whether Mrs. Teach's interest in the St. Pierre property is 'spurious' as contended by the seller, or has validity, as impliedly contended by the buyer, the record is not conclusive. All of the evidence now before the court is of a hearsay variety, which would not control on a motion for summary judgment." 6 Ariz.App. at 58–59, 429 P.2d at 692–693.

It seems reasonably clear from this prior opinion that, if, on remand, there were no circumstances shown effective to change the four-corners meaning of this contract and if the signatory seller on the St. Pierre contract was, in fact, the fee simple owner of the property sold, then there was an unjustified refusal on the part of Safeway to perform its contractual obligations with Levitz. Right or wrong, this decision controls this subsequent appeal. Tucson Gas & Electric Co. v. Superior Court In and For Pima County, 9 Ariz.App. 210, 450 P.2d 722 (1969).

We find nothing in the evidence developed on trial which changes the meaning of this contract. The previous opinion points out that the cross motions for summary judgment, which were the procedural vehicles by which the problem was then brought before the court, left open a number of possibilities as to circumstances giving rise to the contract:

"Affidavits and depositions do not touch upon anything said or done prior to or at the time of the making of this contract. Nor do we even have the physical layout of the various properties concerned before us, which we conceive might shed some light on whether the parties may have contemplated a sale of the subject property separate from the adjacent property under certain limited circumstances. Nor do we know whether there are any local usages of terminology that might cast light upon the meaning of this contract." 6 Ariz.App. at 57, 429 P.2d at 691.

In the trial record, we do not find evidence of any significant communications between the parties which bear upon whether Safeway was to be obligated to buy the subject property after it had secured a satisfactory contract of purchase as to the other properties. The evidence does indicate, and the trial court found, that the seller knew that the purpose for which the Levitz property was being purchased required the purchase of some other land in the vicinity. But there is no evidence of any communication to the seller that Safeway would not, under any circumstances, proceed with the purchase of this property unless it simultaneously purchased the St. Pierre property, or any other particular piece of property in the vicinity.

That Safeway's own undisclosed intentions in this regard were flexible is indicated by the fact that one of its contracts as to the adjoining property contained alternative options as to whether Safeway would take the whole or only part of the property.[2]

The fact that the purchase of other pieces of property was contemplated by Safeway was brought home to the seller by this contract itself. But pre-contract negotiations between the parties shed no light as

2. The Edelman contract gave Safeway the right to take only the most northern 60 feet of this lot (the portion farthest from Speedway) and to give in exchange for this parcel a 60-foot portion of the Heim property.

to what the rights of the parties would be under the particular post-contract circumstances that developed. That Safeway may have been obligated to purchase the subject property, even though the completion of a contract of purchase of one or more of the other parcels of property should fail because of a default on the part of a seller, is left open by anything said or done prior to the execution of this contract.

As for the physical layout of these properties, there is nothing to indicate that a reasonable buyer would not obligate itself to purchase this property without the St. Pierre property. The Levitz land is by far the largest of the four parcels involved. The St. Pierre property is one fourth its size and has no frontage on Speedway. The Levitz property is approximately four full acres in size and has a frontage of 360 feet on Speedway, one of the most important thoroughfares in the City of Tucson for the establishment of retail businesses. The Levitz land is obviously commercially usable without being combined with any adjoining land.

There is no evidence that Levitz was given plans of what Safeway proposed to do with these properties when purchased. There is evidence showing that the undisclosed intent of Safeway was to use both the St. Pierre property and the Levitz property, but we do not consider such evidence to be pertinent to an interpretation of this bilateral, integrated contract. It is not the undisclosed intent of the parties with which we are concerned, but the outward manifestations of assent. This principle of law is expressed well by Justice Holmes:

"* * * the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs * * *."[3] Holmes, The Path of the Law

That courts should not be concerned with the undisclosed intent of the parties is made crystal-clear by a long line of decisions of our Supreme Court, including: Goodman v. Newzona Investment Co., 101 Ariz. 470, 421 P.2d 318 (1966); Brand v. Elledge, 101 Ariz. 352, 419 P.2d 531 (1966); LeBaron v. Crismon, 100 Ariz. 206, 412 P.2d 705 (1966); Galbraith v. Johnston, 92 Ariz. 77, 373 P.2d 587 (1962).

■ Nor is there any evidence in this record of any operative usages which would assist in the construction of this contract.[4] A usage is a habitual or customary practice, more or less widespread, which prevails within a geographical or sociological area. Restatement of Contracts § 245. A usage is a course of conduct and is based upon a series of actual occurrences. Coyner Crop Dusters v. Marsh, 90 Ariz. 157, 175, 367 P.2d 208, 220 (1961), *rehearing granted on other grounds*, 91 Ariz. 371, 372 P.2d 708 (1962); and *see* 2 Wigmore, Evidence § 379 (3d ed. 1940). In order to be controlling upon the parties to a contract, it must be adopted by them, or be well-known to the parties or to persons in their circumstances. Restatement of Contracts § 247, and *see* 5 Williston on Contracts §§ 651 and 657 (3d ed. Jaeger).

■ Here we have no evidence that the word "purchase" has been treated in any one or more transactions as having any particular meaning. As close as the evidence comes to any such testimony is the following:

"A [Bernard A. Rosenbaum][5] In my opinion a purchase takes place in this community when a buyer and a seller have signed what we call a deposit receipt and agreement, earnest money is put up and there is a signature on both parts at that time and a purchase and sale takes place.

3. Holmes, Collected Legal Papers, p. 178.

4. When there is an operative usage as to the meaning of a particular word, or phrase, the cases are legion which give effect to such usage, providing that both parties are fairly chargeable with it. *See*

cases collected in 5 Williston on Contracts § 651, pp. 32–39 (3d ed. Jaeger).

5. Mr. Rosenbaum is a mortgage and real estate broker and member of the bar called as a plaintiff's witness.

\* \* \* \* \* \*

"A [by Mr. Shein] [6] It is true that on occasions that sometimes buyers refer to the fact that, or sellers, that they have either bought or sold a piece of property when they have signed a sales agreement to purchase a piece of property, but *among practicing real estate people* certainly the idea of purchase means you actually acquire title, and this purchase is signed, the property.

\* \* \* \* \* \*

"Q It is true, is it not, Mr. Winter,[7] that in ordinary usage in this area that people refer to a purchase of real estate after they have signed a contract?

"A I agree that some people do *but there* [sic] *are lay people* that I don't consider to be knowledgeable because the fact they might refer to it doesn't mean it is so.

"Q You have never used this in that sense?

"A I doubt very seriously, Mr. Scheff, I personally have. I might have at some time in the past. I would certainly guard against using it that way now, or in recent years."

\* \* \* \* \* \*

"Q (by Mr. Greenfield) Mr. Bagby,[8] you have been with the real estate department of Safeway since 1954?

"A Yes.

"Q Of your own personal knowledge how long have you utilized in any transaction you have been involved in that same contract you have in front of you, Exhibits 1 through 4?

"A The form?

"Q The form.

"A Since I was first employed by Safeway in 1954 and continually since then.

"Q In your capacity with Safeway how do you on other occasions put together acquisitions of multiple parcels for development in shopping centers, other than this transaction?

"A The form generally as this has been discovered for the specific proposed deal.

"Q There have been other occasions when you have assembled multiple parcels such as in this case?

"A Great numbers.

"Q How many would you say?

"A I just don't know. *In Southern California* it could be many dozen total parcels.

"Q And in the utilizations in your multiple acquisitions, this form of agreement is used, is that correct?

"A Yes.

"Q Including paragraph I?

"A Yes.

"Q. In those situations, in those similar situations and in this situation where you have these multiple acquisitions, what is meant by the words, *as far as Safeway is concerned,* by the word 'purchase' as used in that paragraph?

"A Acquisition of title of the larger parcel of the proposed site." (Emphasis added)

In our view, this testimony, as a matter of law, is insufficient to support a finding of an operative usage to vary the meaning of a contract. Custom and usage must be established by "clear and satisfactory evidence." State v. Bowling, 5 Ariz.App. 436, 444, 427 P.2d 928, 936 (1967), and authorities there cited. The testimony in this case only suggests that the word "purchase" in some contexts and in limited circles may have the meaning of acquisition of title but we see no evidence that it has become a custom or usage in this state, or in the Tucson area, or in any circle of which the buyer and seller here were joint members, to ac-

---

6. Mr. Shein is a real estate broker called as a Safeway witness.

7. Mr. Winter is a real estate broker called as a Safeway witness.

8. Mr. Bagby was Safeway's agent in charge of the purchase of these properties.

cord any particular meaning to the word in a contract similar to this.

There is very little other extraneous evidence to assist in the interpretative process. Real estate brokers were called by Safeway to testify that they had read this contract and that, in their opinion, the meaning of the word "purchase" included the connotation of acquiring title. This opinion is refuted by another opinion from a real estate broker called by the plaintiff.

The responsibility for the interpretation of contracts is upon the court. *Kintner v. Wolfe*, 102 Ariz. 164, 167, 426 P.2d 798, 801 (1967), and authorities cited therein. The resolution of any factual issues that may pertain to the construction of a contract is a fact-finding process as to which, when the evidence is conflicting, the decision of the fact finder is conclusive. *Ridara Livestock Co. v. Agricultural Products Co.*, 61 Ariz. 473, 475, 150 P.2d 761, 762 (1944). But, when there is no dispute as to the controlling circumstances, the construction of the contract becomes one of law. *Ridara, supra,* and *see* 4 Williston on Contracts § 601, pp. 303–320 (3d ed. Jaeger). The opinion of real estate brokers as to the meaning of this word in this contract does not change the law or give the court ground to abdicate its responsibility. While we see no harm in the admission of this evidence, it was clearly irrelevant to the task before the court. *See* Baker v. Leight, 91 Ariz. 112, 119, 370 P.2d 268, 273 (1962).

With the circumstances giving rise to the contract now revealed, we are satisfied that the four-corners construction given to this contract was correct. It is our view that the condition precedent expressed in this contract was satisfied when Safeway entered into binding contracts of purchase as to the specified adjoining properties *providing* that these contracts were with the actual owners of the properties. To ascertain this last point, we must look again at the claim of Mrs. Lucy Teach, which is the only flaw in any of the titles to these four properties.

Findings of fact by the trial court, when supported by competent evidence, are, of course, binding upon this court on appeal. Thornton v. Southwest Flour & Feed Co., 8 Ariz.App. 190, 444 P.2d 747 (1968). In this regard, the trial court made the following findings:

"6. * * * *The owner of one of these contiguous parcels was Marilyn J. St. Pierre as guardian of Michael Stephen St. Pierre and Michelle Marie St. Pierre.* [Marilyn J. St. Pierre, as mother and guardian, was the signatory seller in the St. Pierre contract. As indicated in the previous opinion, 6 Ariz.App. at 55, 429 P.2d 686, a court order approving this sale was entered on January 11, 1955.]

\* \* \* \* \* \*

"13. Lucy Albertine Teach has been in possession of the St. Pierre property since 1935 and was a necessary signatory seller in regard to the St. Pierre property, or it would have required a lawsuit to eject her. *However, her possession was not such as to acquire title by adverse possession.*

\* \* \* \* \* \*

"15. In addition to the possession of the St. Pierre parcel by Lucy Albertine Teach, which possession was a tenancy unacceptable to Safeway, there were two (2) other tenants occupying portions of the property who paid rent to Mrs. Teach." (Emphasis added)

Mrs. Teach testified at this trial that she had come to live on this property in 1935, with her sister, Minnie Montgomery, and that, after her sister died in August of 1955, she had lived on the property with her younger sister, Amarintha Frederick, to whom she had paid rent until she died in 1960. She indicated that she had received rent from the youngest sister's home to which "those kids," referring to the "grand kids," of her sister Amarintha, were "entitled." In our view, the finding that Mrs. Teach had acquired no title by adverse possession is supported by the evidence. The fact that the signatory seller had record

title and that the probate court regularly approved the sale is not disputed.

Safeway continues in its briefs on this appeal, to insist that it had the right to refuse to proceed with the St. Pierre contract. With this there can be no quarrel. The St. Pierre contract obligated the seller to provide "a good and merchantable title" and the seller warranted " * * * that said property shall be free and clear of *all other matters* except such as may be approved and accepted by Buyer, in writing." (Emphasis added.) The claim of Mrs. Teach, which as far as this action is concerned has been established to be a spurious one, may nevertheless render the title to the St. Pierre property unmerchantable in that her claim presented a "reasonable possibility of future litigation." *See* Sabin v. Rauch, 75 Ariz. 275, 279, 255 P.2d 206, 208 (1953), clarified and adhered to on rehearing, 76 Ariz. 71, 258 P.2d 991 (1953).

But we do not regard the fact that the state of the title to the St. Pierre parcel was "unacceptable" to Safeway as pertinent to this litigation. As we held in our previous opinion, this was an " * * * if-a-contract-of-purchase-is-negotiated condition, *not* an if-a-contract-of-purchase-is-negotiated -*and* -the -buyer -does -not -default condition." 6 Ariz.App. at 59, 429 P.2d at 693 (emphasis as in previous opinion). The St. Pierre contract was not a part of this contract (*see* our prior opinion, 6 Ariz.App. 58–59, 429 P.2d 686). There were similar provisions for acceptable and merchantable title in this contract, but all obligations of the seller in this regard were fully met. The title to the subject property admittedly has no flaws.

The only way to which the St. Pierre contract is tied in with the subject one is to the extent that there is the question of whether the St. Pierre contract constituted a "purchase" as that word is used in the paragraph setting up a condition precedent in *this* contract. In view of the construction given this key word by our prior opinion, and the lack of circumstances modify-ing that construction, this question must be answered in the affirmative.

The appellant has presented no authority or argument to support a reversal of the judgment rendered in favor of the escrow holder, Arizona Land Title & Trust Co. We deem the appeal as to that judgment to be abandoned. Davis v. Kleindienst, 64 Ariz. 67, 165 P.2d 995 (1946).

The judgment in favor of Arizona Land Title & Trust Company is affirmed; the judgment in favor of Safeway Stores, Inc., is reversed and the cause remanded with instructions to enter an appropriate decree of specific performance as to that defendant.

KRUCKER, J., concurs.

HATHAWAY, Judge (dissenting):

Given a common sense application, the plain language of the agreement would require affirmance. The provision that the agreement " * * * is conditional upon Buyer's *purchase,* upon terms satisfactory to Buyer, of adjacent property * * * " (emphasis added) is clear and meaningful. Webster's Third New International Dictionary defines "purchase" as "the acquiring of title to or property in anything for a price * * * a buying for money or its equivalent * * * something *obtained* for a price in money or its equivalent." (Emphasis added) The following cases hold that the word "purchase" means "acquisition." Marsh v. Lott, 8 Cal.App. 384, 97 P. 163 (1908); Anderson v. Badger, 84 Cal.App.2d 736, 191 P.2d 768 (1948); Shaw v. Dreyfus, 172 F.2d 140 (2d Cir. 1949); Bowles v. Nelson-Ricks Creamery Co., 66 F.Supp. 885 (Idaho 1946); City of Enterprise v. Smith, 62 Kan. 815, 62 P. 324 (1900); Cobb v. Webb, 26 Tex.Civ.App. 467, 64 S.W. 792 (1901).

The Buyer's prerogative under the escape clause of the agreement was reserved for precisely such eventuality as the Teach controversy. This protection should not be smothered by a strained construction reading in ambiguities, nor should it be destroyed by judicial addendum to the agreement.

The judgment should be affirmed as the summary judgment should have been when the first appeal was before us. I believe the former decision was palpably erroneous and the doctrine of the law of the case should not apply. Sibley v. Jeffreys, 81 Ariz. 272, 305 P.2d 427 (1956).